John P. HERRERA, III, and Deborah Herrera, Plaintiffs,

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Defendants.

Civ. A. No. 92–2132–GTV.

United States District Court, D. Kansas.

July 29, 1994.

William S. Robbins, Jr., Dan C. Sanders, Fairchild, Stang, Beal, Barber & Sanders, Kansas City, MO, for John P. Herrera, III, and Deborah Herrera.

C. David Whipple, David W. Whipple, Whipple Law Firm, P.C., Kansas City, MO, Jordan Rossen, Dan Sherrick, Intl. Union, United Auto, Aerospace & Agr. Implement Workers of America, Jay Whitman, Detroit, MI, William W. Hutton, Kansas City, KS, Michael J. Grady, Paul Scott Kelly, Jr., Gage & Tucker, Overland Park, KS, John J. Yates, R. Kent Sellers, Charles J. Williams, Gage & Tucker, Kansas City, MO, for Intern. Union, United Auto, Aerospace and Agr. Implement Workers of America, Local Union 31, United Auto., Aerospace and Agr. Implement Workers of America, UAW, General Motors Corp., L.D. Edwards, Charlie Knott, E.D. Lyman, Joe Powell, Clint Simmons, Joe Liggins, Rene Garcia, Bud Carroll and John L. Melton.

### MEMORANDUM AND ORDER

Van BEBBER, District Judge.

Under consideration by the court are the following motions of the parties:

(Doc. 67)—The Fed.R.Civ.P. 56(b) motion of defendant General Motors Corporation for summary judgment;

(Doc. 71)—The Fed.R.Civ.P. 56(b) motion of defendant International Union, UAW, defendant Local Union 31, UAW, and the individual defendants for summary judgment; and

(Doc. 31)—The Fed.R.Civ.P. 23 motion of plaintiffs John P. Herrera, III, and Deborah Herrera for class certification.

The motions are fully briefed and are ready for disposition. Defendants' motions for summary judgment are granted and plaintiffs' motion for class certification is denied.

This is primarily a labor dispute. On April 9, 1992, plaintiffs, in their own behalf and on behalf of a proposed class, filed a seven-count complaint alleging that defendants engaged in a number of unlawful activities. Seeking to redress defendants' alleged misconduct, plaintiffs assert causes of action under § 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185, the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411 *et seq.*, the National Labor Relations Act (NLRA), 29 U.S.C. § 159(a), the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1101 *et seq.*, and Title IX of the Organized Crime Control Act of 1970 (Racketeer Influenced and Corrupt Organizations (RICO)), 18 U.S.C. § 1961 *et seq.* Plaintiffs seek, on their own behalf and on behalf of the proposed class, declaratory relief, injunctive relief, compensatory damages, treble damages, prejudgment interest, and the costs of this action, including their reasonable attorneys' fees.

Plaintiffs' claims arise from the operation of a program commonly referred to as the "JOBS Bank." The JOBS Bank was a job security program created as a result of the 1984 National Agreement negotiated between General Motors Corporation and the International Union UAW, and was implemented locally in 1987 in connection with the transfer of operations between the old Fairfax plant and a new Fairfax plant. Pursuant to the National Agreement, a JOBS Bank is to be established at any GM plant where the number of employees is being reduced by one of several types of events described in the agreement—primarily the introduction of new technology or productivity improvements. Employees who are laid off from their regular jobs are placed in the JOBS Bank and receive their regular pay rate for performing activities such as volunteer work or community service.

The initial size of a JOBS Bank is based upon the number of laid off employees with one or more years seniority, and the size of the Bank may be increased or decreased by certain events enumerated in the National Agreement. For example, the JOBS Bank will be reduced by one slot for each employee who "breaks seniority" and leaves employment with GM. Employees who accept incentives for voluntary termination of employment [VTEP] or early retirement offers are deemed to break seniority, and the JOBS Bank is reduced by one slot for each employee who accepts such an incentive. In the case at hand, plaintiffs allege that GM offered VTEPs to persons of low seniority who did not fall within the protection of the JOBS Bank. Further, plaintiffs allege that for each such "improper" VTEP accepted by a non-protected person, the JOBS Bank was reduced by one slot. Based upon these reductions, plaintiffs contend that there were not enough JOBS Bank slots available for all persons—including themselves—who should have been entitled to slots under the 1984 National Agreement.

In their motions for summary judgment, the defendants contend that the uncontroverted facts in the case disclose that they are entitled to judgment as a matter of law on plaintiffs' claims. In their motion for class certification, plaintiffs contend that the circumstances of the case are such that it should be maintained as a class action. Because they are dispositive of the case, the court will address defendants' motions first. The discussion of the issues addressed by the parties in their motions for summary judgment is organized here by counts in the complaint, rather than by individual motion.

## I. THE MOTIONS FOR SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment "if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing," that is, pointing out to the district court, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, "a party opposing ... may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

### B. FACTUAL BACKGROUND

In their respective motions for summary judgment, the defendants have included statements of uncontroverted facts in accordance with D.Kan.Rule 206(c). In their response, plaintiffs set out their own statement of facts, but did not refer to any of the numbered facts listed as uncontroverted by defendants. Because there are few substantive discrepancies between the versions of facts set out by defendants and the plaintiffs, and because plaintiffs have not specifically controverted any of the defendants' facts, it appears to the court that the facts of this case are generally uncontroverted. In the few instances where facts appear controverted, the court has considered those facts in the light most favorable to the plaintiffs.

### The Parties

Defendant General Motors Corporation [GM] is a Delaware corporation which owns and operates an automobile assembly facility known as the Fairfax Plant located in Kansas City, Kansas.

Plaintiff John P. Herrera, III, is a member of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and was employed at the Fairfax Plant from approximately 1983 to 1991. In August, 1992, he accepted employment at a GM facility in Baltimore, Maryland. While employed at the Fairfax Plant, John Herrera was elected as and served as a district committeeman between May of 1988 and March of 1991. He also held an appointed position on the transition committee of Local 31.

Plaintiff Deborah Herrera is a member of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and was employed at the Fairfax Plant from approximately 1984 to 1988. In August, 1992, she accepted employment at a GM facility in Baltimore, Maryland.

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America [UAW] is a labor union representing certain hourly employees at GM plants nationwide. Local Union 31, United Automobile, Aerospace and Agricultural Implement Workers of America [Local 31] is the collective bargaining representative for hourly employees at GM's Fairfax Plant.

### The Relevant Agreements

On or about September 21, 1984, GM and the UAW entered into a national collective bargaining agreement with an effective date of October 15, 1984. Relevant to the case at hand is Appendix K to the 1984 National Agreement and its attachments. Appendix K and its attachments describe the programs on which plaintiffs' claims are based, as well as prescribe how those programs are to be administered. Appendix K to the 1984 National Agreement is titled "Memorandum of Understanding Job Opportunity Bank—Security (JOBS) Program." It establishes a "JOBS Program" to prevent layoffs of employees with one or more years of seniority as a result of the introduction of technology, outsourcing or negotiated productivity improvements, under the terms and conditions defined in Appendix K. By its terms, Appendix K does not apply to "an employee impacted by changes in ... customer prefer-

ence, volume related reasons attributable to market conditions, other reasons beyond the control of the Corporation," or certain other reasons specified therein.[1] In addition, the Appendix K JOBS Program does not apply "to employees laid off for a period of model change or plant rearrangement until they otherwise would have been recalled."

Appendix K provides for the establishment of a local JOBS committee composed of management and union representatives to administer the JOBS Program at each plant. It also establishes the National JOBS Committee. Appendix K's JOBS Program specifically includes provisions for the establishment of an "Employee Development Bank," also commonly known as a JOBS Bank, at any GM plant where the number of employees is being reduced by an event covered under Appendix K.

Attachment A to Appendix K of the 1984 National Agreement sets forth guidelines agreed to by GM and the UAW to administer the JOBS Program. Pursuant to Attachment A of Appendix K, employees assigned to the JOBS Bank receive their most recent regular rate of pay and may be assigned to or volunteer for a variety of activities, including training, nontraditional work, or community service. Attachment A to Appendix K also sets forth guidelines for determining the size of the JOBS Bank once it is established and sets forth certain events which will either increase or decrease the size of the Bank. For example, Attachment A provides that once a JOBS Bank is established, its size will be reduced by one slot for each employee in the Bank who breaks seniority (i.e., leaves employment) other than by discharge. Attachment A to Appendix K further provides that a layoff caused by an event not covered by Appendix K will have no impact on the size of the JOBS Bank.

Attachment B to Appendix K creates certain incentive programs to accelerate employee attrition by voluntary termination or retirement. The JOBS Voluntary Termination of Employment Program [VTEP] provides a guaranteed lump-sum benefit to employees who leave their employment with GM voluntarily, subject to specified conditions and limitations. A person who accepts a VTEP payment breaks seniority and ceases to be an employee of GM. Attachment B to Appendix K also creates a JOBS Pension Program, sometimes referred to as mutually satisfactory retirement, which provides retirement benefits to eligible employees with ten or more years of credited service. Each employee who accepts a VTEP or a mutually satisfactory retirement buy-out breaks seniority and causes the JOBS Bank to be reduced by one slot, as described in Attachment A to Appendix K.

Appendix K by its terms permits the parties to "waive, modify or change the National Agreement" and provides that the National JOBS Committee is "specifically empowered to periodically review and evaluate" Appendix K and "make mutually satisfactory adjustments to its provisions."

### Fairfax Plant and Events of 1987 and 1988

In 1985, GM announced that it would cease production at its original Fairfax facility (Fairfax I) and would build a new plant (Fairfax II) which would employ substantially fewer persons. Some time before Fairfax I ceased production, 298 positions were eliminated when Fairfax I changed from a tag relief system to a mass relief system. Under a tag relief system, the production line keeps running while employees on break are temporarily relieved on the line by others. Under a mass relief system, the line stops while all employees take their breaks. Fewer employees are needed under a mass relief system.

The transfer of operations from Fairfax I to Fairfax II was an event covered by Appendix K to the 1984 National Agreement. On March 19, 1987, the management and union representatives serving on the Fairfax JOBS committee negotiated a JOBS Bank containing 1,220 slots for Fairfax II. In negotiating the size of the JOBS Bank, the local JOBS Committee excluded from cover-

---

1. A 1987 National Agreement modified the language of Appendix K slightly regarding the reasons for which employees could be laid off, including volume related decline attributable to market-related conditions.

age under Appendix K the 298 positions previously eliminated by the change from tag relief to mass relief.[2]

By letter dated April 16, 1987, to members of the National JOBS Committee, members of the local JOBS Committee at Fairfax requested approval of Attachment B programs for Fairfax. The programs included VTEP buy-outs and mutually satisfactory retirements. Fairfax I ceased production on May 8, 1987, and all or substantially all hourly employees were laid off.

By letter dated May 11, 1987, members of the local JOBS Committee were notified that the National JOBS Committee had approved the joint request for implementation of Attachment B programs at Fairfax. This letter advised that the JOBS Bank would be reduced by one slot for each VTEP or mutual retirement that was taken. By letter dated June 10, 1987, employees at the Fairfax plant were notified that the VTEP and JOBS Pension Programs had been approved for Fairfax.

Thereafter, VTEPs and mutual retirements were offered and taken by GM Fairfax employees, some even before the JOBS Bank became operational. On November 2, 1987, Fairfax II commenced production. A number of employees were recalled to work at that time, and the JOBS Bank became operational with a pro-rata percentage of JOBS Bank slots. As production increased at Fairfax II, so did the number of employees recalled to work. Likewise, the number of JOBS Bank slots increased pursuant to the terms of Attachment A to Appendix K of the 1984 National Agreement. At the same time, employees continued to take VTEPs and mutual retirements, and the number of JOBS Bank slots was reduced for each such acceptance in accordance with the terms of Attachment A. On February 15, 1988, the JOBS Bank filled and no further VTEPs or mutual retirements were offered; there were no JOBS Bank slots available for employees laid off from their regular jobs after this date.

**The Plaintiffs' Knowledge**

Before Fairfax I closed, plaintiffs attended at least two Local 31 meetings where Peggy Person, an official of the UAW and member of the National JOBS Committee, spoke about topics including Appendix K and the JOBS Bank. The second meeting occurred during the week prior to the Fairfax I shutdown in May, 1987. During the May, 1987, meeting with Peggy Person, plaintiffs learned that the JOBS Bank at Fairfax would contain 1,220 slots.

Deborah Herrera testified at her deposition in this case that when she learned in April or May of 1987 that there were going to be 1,220 JOBS Bank slots, she believed at that time that there should have been more than 1,220 slots and that the announced number of slots did not seem right. John Herrera testified that he had concerns about Local 31's actions in connection with the JOBS Bank which arose from the time of the first 1987 meeting with Peggy Person.

On March 19, 1988, John Herrera filed charges under Article 31 of the UAW Constitution against E.D. "Sonny" Lyman, Local 31 shop committee chairman and a defendant in this action, for "engaging in conduct unbecoming a member of the Union." The charges included an allegation that on February 19, 1988, Mr. Lyman agreed to file but did not actually file a grievance protesting the elimination of the JOBS Bank slots. The charges read:

> Failing to give proper representation as per the N/A. On 2–19–88 Shop Chairman S. Lyman agreed to file a grievance, a grievance protesting managements process of illimination [sic] of the JOBS Banks making our job security as per N/A very insecure, to this date a grievance has not been filed.

Plaintiff was advised by a letter dated March 23, 1988, that the Executive Board would not process his charge against Mr. Lyman. Following the Executive Board's decision not to process plaintiff's charge against Mr. Lyman, the minutes of the Executive Board meeting were read at the next

**2.** Defendants contend that the change to mass relief was not an event covered by Appendix K, and for this reason the 298 jobs were not included in the 1,220 number.

general membership meeting on April 16, 1988. John Herrera was present at the meeting. John Herrera did not appeal the denial of his charges against E.D. Lyman.

On May 26, 1988, John Herrera, acting in his capacity as a Local 31 district committee-man, filed a "group grievance" on behalf of his brother, Phillip Herrera. The grievance read as follows:

> We charge mgt with viol of App K & viol of S.E.L. Program of the 1987 N/A. Mgt has not provided employees with Proper Job Security & established a process of illimination (sic) of our Slots jeopardizing our Job Security in an attempts by Mgt to severance (sic) us From work Force. We demand correction & we be pd all monies & benefits lost at once.

On May 27, 1988, Deborah Herrera was laid off from the Fairfax plant. There was no slot available for her in the JOBS Bank.

### Grievance Procedures & Appeals

The 1984 National Agreement establishes a four-step grievance procedure culminating in binding arbitration before an impartial umpire. At the first step, employee griev-ances are handled by a district committee member from the appropriate local union. At the second step, a grievance is handled on behalf of the employee by a member of the appropriate local union shop committee.

Appendix K provides in part that: "Only those matters governing the size of the Em-ployee Development Bank or governing the treatment of an employee assigned to or impacted by the Bank, as set forth in Attach-ment A to this Memorandum of Understand-ing, will be subject to the Grievance Proce-dures. Such grievances will be filed at the Second Step of the grievance procedure." John Herrera testified that he understood that a JOBS Bank grievance was to be initi-ated at the second step. Based upon his union experience, John Herrera also knew that he could inquire into the status of a grievance by contacting the Fairfax Labor Relations Department.

The 1984 and 1987 National Agreements contain a provision stating that if the interna-tional union, public review board, or conven-tion appeals committee determines that a grievance was improperly disposed of by the local union, the grievance may be reinstated in the grievance process at the step at which it was improperly disposed.

The May 26, 1988, grievance was filed at the first step of the grievance procedure by plaintiff John Herrera in his capacity as a district committeeman. It was handled by zone committeeman Joe Liggins. John Herrera had concerns about Joe Liggins pro-cessing any of his grievances, but made no inquiry as to the status of the May 26, 1988, grievance until shortly before the union hear-ing on January 19, 1990. In approximately September, 1991, plaintiff John Herrera learned of the withdrawal of the May 26, 1988, grievance. He did not file an internal union appeal of that withdrawal. No other grievances were filed by plaintiffs in relation to any of the matters in this lawsuit.

By letter dated December 17, 1988, plain-tiffs filed an internal union appeal with the UAW International Executive Board (IEB) concerning the issues in this case. The ap-peal was prompted by the Herreras' attend-ance at a November 20, 1988, meeting with Peggy Person. This appeal concerned the effect of VTEPs on the number of JOBS Bank slots, and was filed within the thirty days provided for the filing of such appeals under the UAW constitution. The appeal was denied by the IEB in a letter dated June 14, 1990. Thereafter, plaintiffs appealed the IEB's decision to the UAW Convention Ap-peals Committee, and that appeal was denied in a decision of September 8, 1991. Plaintiffs received the decision on October 10, 1991, and this lawsuit was filed on April 9, 1992.

### C. THE HYBRID CLAIMS: SUMMARY JUDGMENT ON COUNTS I, II, AND IV

In their motions, all defendants in this action seek summary judgment on Counts I and II of plaintiffs' complaint. Ad-ditionally, the international and local union defendants seek summary judgment on Count IV. These three counts allege claims under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Counts I and II are commonly referred to as "hybrid" section 301 claims, wherein an aggrieved em-

ployee sues both the employer for breach of the collective bargaining agreement and the union for breach of its duty of fair representation in failing to process the employee's claim through the contractual dispute resolution process. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983). The claims against the union and the employer are "inextricably interdependent." *United Parcel Serv. v. Mitchell,* 451 U.S. 56, 66–67, 101 S.Ct. 1559, 1566, 67 L.Ed.2d 732 (1981). In order to prevail in a section 301 hybrid suit, the employee must prevail against both the employer and the union. *Id.*

Count IV alleges a section 301 claim for breach of the union's duty of fair representation against the union defendants only. The arguments presented by the defendants in their motions and discussed in this section of the memorandum and order are all relevant to Counts I, II, and IV.

■■■ In *DelCostello v. International Brotherhood of Teamsters,* the Supreme Court held that a hybrid section 301 claim is subject to the six-month statute of limitations set out in 29 U.S.C. § 160(b). 462 U.S. at 169–70, 103 S.Ct. at 2293–94. The six-month statute of limitations is applicable to both defendants. *Vadino v. A. Valey Engineers,* 903 F.2d 253, 260 (3rd Cir.1990). Moreover, the six-month period "begins to run when an employee knows or in the exercise of reasonable diligence should have known or discovered the acts constituting the union's alleged violations." *Lucas v. Mountain States Telephone & Telegraph,* 909 F.2d 419, 420–21 (10th Cir.1990) (citations omitted). In a typical section 301 hybrid claim, the limitations period begins to run when the employee learns or should have learned that the union has rejected or abandoned the claims he or she has asserted against an employer for a breach of the collective bargaining agreement. *Id.* at 421.

■■■ In addition to the typical section 301 hybrid suit described in the preceding paragraphs, a section 301 hybrid action may arise from a joint action by the employer and the union. *See Landry v. Air Line Pilots Ass'n Int'l AFL–CIO,* 901 F.2d 404, 410–11 (5th Cir.) (breach occurred during process of negotiating collective bargaining agreement), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *United Indep. Flight Officers v. United Air Lines,* 756 F.2d 1262, 1270 (7th Cir.1985) (breach took place during negotiations, rather arising from a grievance). In this type of hybrid suit, the alleged breaches by the employer and the union may occur at the same time, as opposed to the sequential breaches seen in a more typical hybrid action.

Plaintiffs have alleged both types of claims in this case: As the court understands Count I, plaintiffs allege that General Motors breached the 1984 National Agreement when it offered VTEP buy-outs to individuals who were not protected under the JOBS program, and by eliminating one JOBS Bank slot whenever a non-protected individual accepted such a VTEP offer. Count I also includes claims against the union defendants based upon two separate breaches of their duty of fair representation. First, plaintiffs allege that the local union breached its duty by ignoring or processing in a perfunctory fashion the meritorious group grievance filed by plaintiffs,[3] and that the international union breached its duty of fair representation by condoning and ratifying the actions of the local union concerning the group grievance. Second, plaintiffs claim that the union defendants breached their duty of fair representation by negotiating, agreeing to, implementing, and ratifying the plan that permitted VTEP buy-outs to be offered to persons who were not protected by the JOBS Program, and which allowed the JOBS Bank to be improperly reduced by one slot for every

---

**3.** The court notes that although Count I refers to only a "meritorious group grievance," the court assumes that plaintiffs are referring to the group grievance filed by plaintiff John Herrera on May

26, 1988. This grievance charged management with a violation of Appendix K by not providing employees with proper job security and by elimi-

VTEP accepted by such a non-protected person.[4]

Count II is essentially the same claim as Count I, although damages for emotional distress are included in Count II. Count IV is brought against the international and local union defendants only, and alleges that those defendants breached their duty of fair representation by failing to allow a membership vote on the agreement that allowed VTEPs to be offered to non-protected individuals and the JOBS Bank to be improperly reduced in size.

■■■ As an initial matter, defendants argue and the court agrees that to the extent plaintiffs' breach of duty of fair representation claim is based upon the union's failure to appropriately process the May 26, 1988, grievance, summary judgment must be granted for the defendants. No internal union appeal of the union's withdrawal of that grievance was ever filed. Employees dissatisfied with the outcome of the grievance process must also exhaust internal union appeals where such procedures can result in either complete relief to the aggrieved employee or the reactivation of the grievance. *Clayton v. International Union, UAW,* 451 U.S. 679, 695, 101 S.Ct. 2088, 2098, 68 L.Ed.2d 538 (1981).[5] In the present case, the collective bargaining agreements provide for the reinstatement of grievances found to be meritorious on appeal.

■■■ The court next addresses plaintiffs' claim for breach of the duty of fair representation as it is based upon the union's negotiation, agreement, and collusion with General Motors to offer VTEPs to person not protected by the JOBS Program. Defendants' first argument in support of their motion for summary judgment is that the statute of limitations necessarily began to run when the plaintiffs' learned in May, 1987, that the JOBS Bank would contain 1,220 slots. Defendants contend that plaintiffs' section 301

claim accrued on that date, the date when they first suspected that the JOBS Bank was not large enough to include all of the people currently on layoff or scheduled to be placed on layoff with the change to Fairfax II. Under defendants' theory, if the JOBS Bank was initially large enough to encompass everyone who later accepted a VTEP, there would have been no basis for plaintiffs' section 301 claim.

The court finds this argument without merit in that it ignores the actual nature of plaintiffs' section 301 claim. As the court reads it, plaintiff's complaint alleges that GM breached Appendix K of the collective bargaining agreement when it allowed VTEP buy-outs to be offered to and accepted by persons who were not protected by the JOBS program, and that the JOBS Bank was improperly reduced by one slot for every improper VTEP accepted. Plaintiffs contend that the union defendants breached their duty of fair representation when they agreed to or acceded to the plan to offer improper VTEP buy-outs and the attendant reduction in JOBS Bank slots. Plaintiffs' complaint is not based on the initial number of JOBS Bank slots.

■■■ However, defendants make a second argument concerning the effect of the statute of limitations which has merit. They contend that the statute of limitations necessarily began to run no later than May 26, 1988, when John Herrera filed the group grievance, or on May 27, 1988, when Debbie Herrera was dropped from the JOBS Bank and placed on layoff. Defendants argue that the uncontroverted facts of this case establish that plaintiffs were aware that JOBS Bank slots were being eliminated at an accelerated pace no later than May of 1988, even if plaintiffs did not know at that time that the claimed improper VTEP buy-outs were causing the reduction of slots. Defendants go on to argue

---

nating JOBS Bank slots, and is the only group grievance mentioned in the complaint.

4. For ease of reference in this memorandum and order, the court will refer to the plan whereby VTEPs were offered to non-protected individuals as an "agreement." The court recognizes that the defendants contend that no actual agreement to offer VTEPs to non-protected persons existed.

5. Moreover, the court notes that plaintiff John Herrera waited over one and a half years after filing the May, 1988, grievance before inquiring as to its status. The failure to act with diligence could cause the court to deem the cause of action accrued at the point in time when he stopped acting with diligence. *See infra* p. 1541.

**1540**

that plaintiff Herrera did not act with diligence in pursuing the May, 1988, grievance, and that he failed to file an internal union appeal concerning the withdrawal of that grievance. Defendants contend that plaintiffs' section 301 claims are barred by the applicable six-month statute of limitations, or in the alternative, by plaintiff John Herrera's failure to exhaust his private remedies.

In response, plaintiffs contend that November 20, 1988, is the date on which the limitations period for this action began to run. It was on this date that plaintiffs learned in a meeting with Peggy Person of the existence of an "agreement" which allowed VTEP buy-outs to be extended to non-protected persons. Plaintiffs further argue that the December 17, 1988, internal union appeal of the improper VTEP buy-outs was filed within the 30–day time period for filing internal union appeals, and that the appeal acted to toll the six-month limitations period until plaintiffs were notified of its resolution on October 10, 1991. This lawsuit was filed within six-months of that date. Under plaintiffs' theory, this action would be timely.

The court concludes that the six-month limitations period began to run no later than May 27, 1988. By this date, John Herrera had filed the May 26, 1988, group grievance concerning the elimination of JOBS Bank slots. Deborah Herrera had been laid off from the Fairfax plant and there was no JOBS Bank slot for her. Moreover, in March of 1988, John Herrera had filed charges under Article 31 of the UAW Constitution against defendant Lyman, shop committee chairman, which included an allegation that on February 19, 1988, Mr. Lyman agreed to file but did not actually file a grievance protesting the elimination of the JOBS Bank slots. The uncontroverted facts of this case show that at this point in time, plaintiffs clearly knew or should have known that the number of JOBS Bank slots was being reduced at an accelerated pace.

The court assumes for purposes of this motion that the plaintiffs did not learn until the November 20, 1988, meeting with Peggy Person that the JOBS Bank was being reduced at an accelerated pace because VTEP buy-outs were being offered to non-protected

persons. Plaintiffs also did not know and had no reason to know until that date that the claimed improper VTEPs occurred as a result of the local JOBS committee's 1987 arrangement concerning the implementation of Appendix K programs at Fairfax. However, the point in time when plaintiffs learned of the *reason* for the problems with the elimination of JOBS Bank slots is not the event which triggers the running of the limitations period. Rather, the point in time when plaintiffs knew or should have known of the *existence* of the claimed improper elimination of JOBS Bank slots causes the limitations period to commence.

Plaintiffs have argued in their brief in opposition to the motions for summary judgment that the May 26, 1988, grievance does not establish that they were aware of the claimed improper reduction in JOBS Bank slots, because it specifically addressed issues related to the May, 1988, layoff from the Fairfax plant, and did not deal with the 1987 agreement which allowed VTEPs to be offered to ineligible employees. The court concludes that although the May, 1988, layoff and the lack of JOBS Bank slots for those laid off may have prompted plaintiff John Herrera to file the grievance, it is uncontroverted that the grievance did in fact question the elimination of JOBS Bank slots. The events of March and May, 1988, establish that plaintiffs knew or at the very least should have known by May 27th that the Appendix K programs at Fairfax were being administered in such a way as to cause the JOBS Bank to be improperly reduced in size.

 If May 27, 1988, was the latest date on which plaintiffs' hybrid claim concerning the improper reduction of JOBS Bank slots accrued, then the six-month limitations period of section 10(b) of the LMRA, 29 U.S.C. § 160(b), began to run on that date and would have expired on December 27, 1988, unless tolled for some reason. The court must determine whether the May, 1988, grievance served to toll the six-month limitations period. If the grievance had been diligently pursued through proper grievance procedures, the section 10(b) limitations period would not have begun to run until the grievance was procedurally exhausted or the

union abandoned pursuit of the grievance. *See Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) (exhaustion of contractual grievance procedures required before bringing suit under section 301). As it happened, the grievance was withdrawn on May 27th, 1988, by defendant Joe Liggins, the zone committeeman who was charged with pursuing the grievance in accordance with the National Agreement. However, defendant Herrera was not informed of the withdrawal of the grievance, and did not make inquiry into the status of the grievance until January, 1990.

As noted earlier in this opinion, plaintiff John Herrera did not inquire into the status of his grievance until eighteen months after it was filed and withdrawn. Moreover, although John Herrera did inquire into the status of the grievance in January, 1990, he apparently received no answer from union officials. Nevertheless, he did not inquire again about the grievance until sometime in or about September, 1991,[6] when he finally learned it had been withdrawn. Plaintiff failed to make inquiry through proper channels despite his familiarity with grievance procedures, and despite his knowledge that the status of a grievance could be determined by calling the Fairfax Labor Relations Department.

 The six-month limitations period will not be tolled when an employee is inexcusably dilatory with regard to the pursuit of his or her grievance. *Demars v. General Dynamic Corp.,* 779 F.2d 95, 99 (1st Cir.1985) (employee failed to make meaningful inquiry for nearly three years after grievance filed; statute of limitations on § 301 hybrid suit not tolled); *see also Metz v. Tootsie Roll Indus.,* 715 F.2d 299, 304 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). The court concludes that plaintiff John Herrera was not diligent in his pursuit of the May, 1988, grievance. As a result, the grievance did not serve to toll the limitations period for the length of time necessary for the April 9, 1992, filing of this action to be timely.

 The court also concludes that plaintiffs' section 301 claim is barred based upon plaintiffs' failure to exhaust internal union appeal remedies. As mentioned earlier in this order, it is uncontroverted that upon learning of the withdrawal of his May, 1988, grievance, John Herrera filed no internal union appeal. The exhaustion of internal union remedies is required prior to filing a section 301 claim in federal court where an internal union appeals procedure can result in either complete relief to an aggrieved employee or reactivation of his grievance. *Clayton v. International Union,* 451 U.S. 679, 695, 101 S.Ct. 2088, 2098, 68 L.Ed.2d 538 (1981). The 1984 and 1987 National Agreements provide that an employee's grievance can be reactivated if a union appellate body reverses the local union's disposition of the grievance. Thus, in the present case, exhaustion of internal union remedies after the withdrawal of the May, 1988, grievance was required.

Plaintiffs's brief in opposition to the motions for summary judgment also includes an argument that their complaints about the size of the JOBS Bank and the elimination of JOBS Bank slots were not grievable, but were actually the proper subject of an internal union appeal only. The court finds it unnecessary to reach the merits of this argument because plaintiffs did not file an internal union appeal within thirty days after their claims accrued in May of 1988. Plaintiffs did file an internal union appeal concerning the improper VTEPS in December, 1988, but based upon the court's prior conclusions, this appeal was untimely and could not have operated to toll the six-month statute of limitations. Thus, plaintiffs' argument concerning the proper method for the pursuit of their complaints does not affect the court's conclusion on the statute of limitations issue.

Based upon the statute of limitations and the failure to exhaust theories described in the preceding paragraphs, summary judgment must be granted in favor of all defendants on Count I. As Count II is also a

---

**6.** The uncontroverted facts do not establish the precise date when plaintiff Herrera learned of the grievance's withdrawal.

hybrid section 301 claim which differs from Count I only to the extent it includes a claim for damages for emotional distress, summary judgment on Count II also must be granted in favor of the defendants.

■ Summary judgment on Count IV must also be granted in favor of the union defendants based upon the section 10(b) statute of limitations. In Count IV, plaintiffs allege that the international and local union defendants violated section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), when they breached their duty of fair representation concerning the failure to protect the 1,220 JOBS Bank slots. The claim is premised upon the local and international unions' alleged failure to allow a ratification vote by the local membership of the improper VTEP agreement and misrepresentation regarding the protection of JOBS Bank slots. This claim would have accrued at the same time as the claims contained in Counts I and II, and is barred for the same reasons.

## D. THE LMRDA CLAIM: SUMMARY JUDGMENT ON COUNT III

■ In Count III, plaintiffs have alleged that the union defendants violated section 101 of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 411 et seq., by failing to submit their agreement concerning the implementation of the Appendix K JOBS Program at Fairfax to a local membership ratification vote pursuant to Article XIX, Section 13 of the UAW Constitution. Plaintiffs claim that the agreement for the implementation of the programs, which resulted in the improper VTEP buy-outs, was a modification of Appendix K which should have been submitted to a membership vote pursuant to the UAW Constitution.

In their motion and memorandum in support, the union defendants have set forth several arguments concerning the appropriateness of summary judgment on this count. The defendants argue that the claim is barred by the six-month statute of limitations in section 10(b) of the LMRA, that the claim is barred by plaintiffs' failure to exhaust their internal union remedies, and that the claim lacks substantive merit because there

was no violation of the UAW Constitution. Plaintiffs' brief in opposition to the motion does not address defendants' arguments, other than to state that plaintiffs' contentions concerning Count I and II are applicable to Count III on the statute of limitations issue. Plaintiffs have not addressed defendants' argument concerning the merit of the claim in any respect.

In their complaint, plaintiffs allege in Count III that the agreement which allowed VTEP buy-outs to be offered to individuals who were not protected under the JOBS Program was in conflict with the provisions of Appendix K and Attachments A and B of the 1984 National Agreement. The UAW Constitution requires that the terms of such an agreement be submitted to the local union membership for approval. Defendants argue, however, that the modification was contemplated, anticipated, or allowed by the 1984 National Agreement, and modification of Appendix K programs at Fairfax was thus "within" the National Agreement and not a change or "supplement" to it which would require a vote. See Adams v. General Motors Corp., No. 89–1212–C, 1992 WL 567312 (S.D.Ind. May 19, 1992).

■ Whether union members have the right to vote on a matter is governed solely by the private contractual agreements between the union and its members. McGinnis v. Local 710, Int'l Brotherhood of Teamsters, 774 F.2d 196, 199 n. 1 (7th Cir. 1985), cert. denied, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986). The question of whether local union members had a right to vote on the modification of Appendix K programs at Fairfax is a question of law, and may be resolved by applying the terms of the UAW Constitution to the 1984 National Agreement and the modification and application of Appendix K at Fairfax. Adams, 1992 WL 567312 at *5. The Labor–Management Reporting and Disclosure Act does not create any independent right to vote on an issue, nor does it define when votes are to be taken. McGinnis, 774 F.2d at 199 n. 1. Plaintiffs allege that the union defendants violated Article XIX, Section 3, of the UAW Constitution, which provides that:

No Local Union Officer, International Officer or International Representative shall have the authority to negotiate the terms of a contract or any supplement thereof with any employer without first obtaining the approval of the Local Union. After negotiations have been concluded with the employer, the proposed contract or supplement shall be submitted to the vote of the Local Union membership, or Unit membership in the case of an Amalgamated Local Union, at a meeting called especially for such purpose, or through such other procedure, approved by the Regional Director, to encourage greater participation of members in voting on the proposed contract or supplement.

Plaintiffs also point to section 220 of the 1984 National Agreement, which provides that: "No provisions of any local agreements between local Plant Managers and Shop Committees therein shall supersede or conflict with any provisions of this Agreement."

As established by the uncontroverted facts of this case, Section II(E) of Appendix K provides in relevant part that: "Efforts of the local parties to improve operational effectiveness will be encouraged and supported by the national parties including, as may be appropriate, approval of requests to waive, modify or change the National Agreement." Section III(H) of Appendix K further states that: "The National JOBS Committee is specifically empowered to periodically review and evaluate the operation of this Memorandum of Understanding and make mutually satisfactory adjustments to its provisions during the term of the Memorandum." Defendants argue that these provisions of Appendix K contemplate modifications to programs of the type alleged by plaintiffs in this case, and as such, no further ratification by union membership is necessary.

It appears to the court based upon its reading of these pertinent provisions that modification of the JOBS Program by the JOBS Committee was contemplated by Appendix K. Therefore, Article XIX, Section 3 of the UAW Constitution was not violated and plaintiffs' LMRDA claim must fail. Plaintiffs have made no argument, pointed to no law, and come forward with no facts from which the court could conclude differently.

## E. THE ERISA CLAIM: SUMMARY JUDGMENT ON COUNT V

In Count V, plaintiffs allege that GM violated section 510 of ERISA, which prohibits the interference with protected rights under the statute. 29 U.S.C. § 1140. Specifically, plaintiffs contend that in offering VTEP buy-outs to individuals who were not protected under the JOBS Program and eliminating one JOBS Bank slot for each non-protected person's acceptance of a VTEP, GM caused plaintiffs to be placed on layoff status and forced plaintiffs to prematurely exhaust their benefits under two GM welfare benefits plans and risk losing credited service toward GM's pension plans. Defendant GM argues that plaintiffs have no claim under ERISA § 510 and that summary judgment is warranted on Count V.

Defendant GM first argues that to the extent plaintiffs' ERISA § 510 claim is based upon the GM Pension Plan, their claim must fail because it is based solely upon vested employees' allegations of a lost opportunity to accrue future benefits. Defendant contends that this type of allegation is insufficient to support a section 510 claim. It is uncontroverted that both John and Deborah Herrera were vested in the pension plan at the time they were dropped from the JOBS Bank and placed on layoff. Plaintiffs argue that ERISA § 510 does extend to claims by vested employees for intentional interference with their ability to accrue additional benefits.

The court agrees with plaintiffs that section 510 can and does apply to claims based on intentional interference with the accrual of additional benefits. *See Babich v. Unisys Corp.*, 842 F.Supp. 1343, 1350–51 (D.Kan.1994). However, the law is clear that a claim by a vested employee based upon the lost opportunity to accrue additional benefits must be supported by some evidence of the employer's specific intent to interfere with ERISA rights. Defendants have cited the District of Minnesota Opinion *Corum v. Farm Credit Servs.*, 628 F.Supp. 707, 718 (D.Minn.1986), in support of their argument

concerning the non-viability of plaintiffs' ERISA claim, and the court finds this opinion instructive.

The *Corum* court described the law of ERISA regarding claims by vested employees as follows:

> In order to recover on his ERISA claim, plaintiff must establish that defendant discharged him with the specific intent to interfere with plaintiff's rights under defendant's protected benefit plan. [citations omitted] Denying a vested employee the opportunity to accrue additional benefits, however, has only an incidental effect on plaintiff's right to benefits. Such an impact, moreover, "would result from any discharge." *Baker v. Kaiser Aluminum and Chemical Corp.*, 608 F.Supp. 1315, 1319 (N.D.Cal.1984). Where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth sufficient evidence to defeat summary judgment. *See Baker*, 608 F.Supp. at 1319. Such is the case here, and the Court will grant summary judgment on [plaintiff's ERISA count].

The *Corum* court's reasoning has been followed in numerous decisions. *See, e.g., Clark v. Resistoflex Co.*, 854 F.2d 762, 771 & n. 7 (5th Cir.1988); *Buko v. American Medical Laboratories, Inc.*, 830 F.Supp. 899, 906 (E.D.Va.1993), *aff'd*, 1994 WL 319178 (4th Cir. July 5, 1994); *Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 232 (S.D.N.Y.1989). Moreover, the Court of Appeals for the Tenth Circuit has held in two recent unpublished opinions that a mere diminishment in pension benefits alone is insufficient to establish a § 510 ERISA violation. *Card v. Hercules, Inc.*, 5 F.3d 545, 1993 WL 351337, at *3 (10th Cir. Aug. 19, 1993) (fact that plaintiff would have received a larger pension had he worked longer is insufficient to establish the intent necessary for a section 510 claim); *see Dodson v. New York Life Ins. Co.*, 944 F.2d 911, 1991 WL 180090 (10th Cir. Sept. 10,

1991) (no specific evidence of ERISA violation).

In the present case, plaintiffs have argued that the allegations in their complaint that GM had an illegal motive to force them to risk the loss of credited service toward pension benefits must be taken as true. This would be the analysis in a Rule 12(b)(6) motion to dismiss based upon the complaint. However, in light of the case law concerning the evidence necessary to withstand summary judgment on a claim based on a vested employee's loss of future benefits, and because defendant GM has argued that plaintiffs are unable to support a claim under ERISA § 510, the burden is on plaintiffs to come forward with some evidence of GM's intent to violate their ERISA rights. As the *Corum* court noted, a loss of the opportunity to accrue additional benefits occurs in any discharge; plaintiffs must come forward with something more than speculation and conjecture regarding GM's motive in order to base an ERISA § 510 claim on the loss of future benefits. Because plaintiffs have produced no such evidence here, summary judgment must be granted in favor of defendant on plaintiffs' claim for future pension benefits.

GM is also entitled to summary judgment to the extent plaintiffs have based their ERISA § 510 claim on the use and possible exhaustion of the benefits to which they were entitled under GM's welfare benefit plans. Plaintiffs allege in their complaint that GM violated ERISA § 510 when it forced them to use and possibly exhaust their benefits under the GM Supplemental Unemployment Benefit Plan, and the GM Guaranteed Income Stream Program while on layoff from the Fairfax facility. Both of these are welfare benefit plans which provide an income or unemployment benefit to persons on layoff from GM. Defendant argues, and the court agrees, that no ERISA § 510 claim can be based simply upon the *use* of benefits to which an employee is entitled. The court is aware of no case law or statutory authority under which the receipt of benefits can constitute a violation of section 510.[7]

---

7. Even reading plaintiffs' complaint in the most liberal light, plaintiffs can at most be alleging a section 510 claim based upon their lost ability to accrue future benefits under the two GM welfare benefit plans. If this is what plaintiffs are claiming, such a claim would fail for the same reasons

## F. THE RICO CLAIMS: SUMMARY JUDGMENT ON COUNTS VI AND VII

 Counts VI and VII allege violations of the RICO statute, 18 U.S.C. § 1961 *et seq.,* based upon the offer and acceptance of VTEP buy-outs to friends or relatives of the individual union defendants in exchange for the union defendants' acquiescence in GM's "scheme" to improperly reduce the number of JOBS Bank slots and lessen the corporation's financial burden. Plaintiffs also allege that the individual union defendants were offered and actually paid by GM for twelve hours of work per day for the time period beginning in 1985 and ending in or around April, 1988, even though they were not entitled to the full amount of such pay under the applicable terms of the collective bargaining agreement. According to the complaint, the described activities violate 18 U.S.C. 1962(b) in that defendants have, through a pattern of racketeering activity, acquired or maintained, an interest in or control over an enterprise [the local union] which is engaged in or the activities of which effect interstate commerce, and that as a result, plaintiffs have suffered damages. The complaint alleges that the alleged offers of improper VTEPS to friends and relatives of the individual union defendants, as well as the payment of unearned pay to the union defendants, constitute indictable offenses under 29 U.S.C. § 186(b)(1), which prohibits the payment, lending, or delivering of money or other thing of value by an employer to union representatives.

The union defendants and GM argue in their motions for summary judgment that plaintiffs cannot establish a genuine issue of material fact concerning the existence of predicate acts upon which a civil RICO claim can be based.[8] Defendants contend that plaintiffs' complaint consists entirely of conclusory allegations concerning the offer of improper VTEPs to friends and relatives of the individual union members, as well as conclusory allegations and rumors concern-

ing payments to individual union defendants for work not actually performed. Defendants further contend that plaintiffs have submitted no evidence to establish that any improper VTEPs were actually offered to friends or relatives of the union defendants, and that plaintiffs have submitted no evidence to establish that the individual union defendants received any unearned pay from GM.

Upon review of the parties' briefs concerning the existence of predicate acts upon which plaintiffs' RICO claims may be based, the court concludes that plaintiffs are unable to defeat defendants' showing that there is an absence of evidence to support the plaintiffs' case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, "a party opposing ... may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Here, in response to defendants' arguments, plaintiffs have come forward with three pieces of evidence which they argue establish a genuine issue of material fact regarding the existence of predicate acts upon which a RICO claim may be based. First, plaintiffs present the deposition testimony of defendant L.D. Edwards wherein he admitted that his nephew received a VTEP. Second, plaintiffs present the deposition testimony of Tim Danahy, who testified that union officials received a guaranteed minimum of pay for twelve hours per day, six days per week during negotiations. Danahy also testified that the officials received pay for ten hours per day, six days per week when the officials were assisting in the training process.

However, plaintiffs have failed to come forward with any evidence which establishes,

that plaintiffs' claim based upon the lost opportunity to accrue pension benefits fails.

8. The court recognizes that defendants have advanced other bases for summary judgment on

plaintiffs' RICO claims. However, because the issue concerning the proof of predicate acts is dispositive of the RICO claims, the court does not reach defendants' other arguments.

**1546**

or from which the court could infer, that the described acts were improper. The union defendants, in their memorandum in support of their motion and in their reply to plaintiff's memorandum in opposition, contend that all acts complained of by plaintiffs were proper. Defendants contend there is no evidence to show that Edwards' nephew's VTEP was not properly offered and awarded, and further contend that the guaranteed pay to union officials was proper as pay for time spent by GM employees on union business.

 It is not improper for an employer to make payment to his or her employees for their services as employees. 29 U.S.C. § 186(b)(2). Moreover, the law is clear that payments to union officials for time spent on union business does not violate 29 U.S.C. § 186. *NLRB v. BASF Wyandotte Corp.,* 798 F.2d 849, 852–56 (5th Cir.1986). Speculation that the payments to union officials for time spent during negotiations or training were undeserved, or that the VTEP accepted by a nephew of L.D. Edwards was not properly given, is insufficient to meet plaintiffs' burden to withstand summary judgment.

## II. MOTION FOR CERTIFICATION OF CLASS

Because the court has concluded that summary judgment must be granted in this lawsuit on all plaintiffs' claims, plaintiff's motion for class certification is denied as moot.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendant General Motors' Motion for Summary Judgment (Doc. 67) is granted.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by the International Union, UAW, Local 31, UAW, and the individual defendants (Doc. 71) is granted. The case is dismissed.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Certification of Class (Doc. 31) is dismissed as moot.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**