OPINION OF THE COURT
NYGAARD, Circuit Judge.
In this appeal, we must decide whether an employer granting paid leaves of absence to employees who then become the union’s full-time grievance chairmen violates § 302 of the Labor Management Relations Act, 29 U.S.C. § 186. The district court held that this practice is illegal, relying on our decision in Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101 (3d Cir.1986). We will reverse, and in doing so, overrule significant portions of Trailways.
Í
The facts are stated comprehensively in the district court’s opinion, Caterpillar, Inc. v. International Union, United Automobile Workers, 909 F.Supp. 254 (M.D.Pa.1995). For our purposes it suffices to recount that the United Auto Workers, its Local 786 and Caterpillar have been parties to a collective bargaining agreement since 1954. Until 1973, the agreement contained a “no-docking” provision allowing employees who were also union stewards and committeemen to devote part of their work days to processing employee grievances without losing pay, benefits or full-time status. In 1973, this agreement was expanded to allow the union’s full-time union committeemen and grievance chairmen to devote their entire work week to union business without losing pay. These employees are placed on leave of absence and are paid at the same rate as when they last worked on the factory floor. They conduct that business from the union hall, perform no duties directly for Caterpillar, and are not under the control of Caterpillar except for time-reporting purposes.
In 1991, a nationwide labor dispute erupted between Caterpillar and the union, which resulted in the employees returning to work without a contract. A year later, Caterpillar *-530 unilaterally informed the union that it would cease paying the grievance chairmen and' questioned the legality of such payments, notwithstanding that it had paid them without complaint for eighteen years. The union filed an unfair labor practice charge with the National Labor Relations Board, alleging that, by unilaterally rescinding the payments, Caterpillar refused to bargain in good faith. A month later, Caterpillar filed this suit seeking a declaratory judgment that those payments violate § 302 of the LMRA.
The district court stayed its proceedings pending the decision of the NLRB. An administrative law judge later issued a recommended decision and order dismissing the union’s charges, finding that the payments violated § 8 of the National Labor Relations Act.[1] The district court then lifted the stay and held that Caterpillar’s payments to the union’s full-time grievance chairmen violated § 302. The union now appeals.
II.
A.
Section 302(a) of the LMRA provides:
It shall be unlawful for any employer ... to pay, lend, deliver, or agree to pay, lend, or deliver, any money or other thing of value—
(1) to any representative of any of his employees who are employed in an industry affecting commerce; or
(2) to any labor organization, or any officer or employee thereof, which represents ... any of the employees of such employer who are employed in an industry affecting commerce[.]
29 U.S.C. § 186(a). Caterpillar is an employer in an industry that affects commerce and the grievance chairmen are representatives of Caterpillar’s employees. On the face of § 302(a), then, Caterpillar’s wage payments to them would appear to be unlawful. Section 302(c), however, provides that
[t]he provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer ... to any representative of his employees, ... who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer[.]
29 U.S.C. § 186(c)(1). Thus, if the grievance chairmen receive their compensation “by reason of’ their “service as employees,” then Caterpillar’s wage payments are lawful.
In Trailways, the employer agreed to continue making contributions to a joint union-management trust fund on behalf of employees who had taken leaves of absence to devote their time to full-time union positions.[2] There, the union argued that those payments could pass muster under § 302(c)(1), which permits payments to former employees “as compensation for, or by reason of, [their] service as ... employee[s.]” The Trailways court rejected that possibility as a matter of statutory construction, opining:
To the Union, the pension fund contributions made on behalf of former employees currently on leave to serve as union officials were earned solely “by reason” of their past service to Trailways. But for their past employment by Trailways, the Union contends, these officials would not be eligible for pension fund contributions; therefore, these payments are “by reason of their service as an employee of’ Trailways.
A logical reading of the statute makes clear that the “payments to former employees’ exemption” of § 302(c)(1) applies solely to payments made as “compensation or by reason of’ the former employees past service to the employer. While the Union is correct in asserting that had these individuals never been Trailways’ *-529 employees they would not be eligible for pension contributions made on their behalf, it doés not therefore follow that the pension fund contributions made by Trailways pursuant to the collective bargaining agreement were made “in compensation for, or by reason of,” their former service to Trailways- so as to fall within the § 302(c)(1) exception. Clearly, the statute contemplates payments to former employees for past services actually rendered by those former employees while they were employees of the company. Just as clearly, however, the pension fund benefits paid on behalf of former employees serving as union officials while on leave from Trailways are not compensation for their past service to Trailways.
Id. at 105-06 (emphasis in original).[3]
Were we to follow Trailways, its holding would control our decision in this case. The grievance chairmen cannot be considered current employees of Caterpillar who are being compensated for their current services. The chairmen perform no services directly for Caterpillar. Instead, they handle grievances and other labor matters for the union, a situation that often places them in a position adverse to Caterpillar’s. Section 302(c)(1) legalizes payments to current or former employees based on their “services” as employees, not their “status” as such. Thus, the mere fact that the chairmen remain on the Caterpillar payroll and fill out the appropriate forms and time sheets to get paid is legally irrelevant.
The union argues that, unlike the situation under subsection (c)(5) in Trailways, under subsection (c)(1) the chairmen can be employees of both the union and the employer. It relies especially on NLRB v. Town & Country Electric, — U.S. —, —, 116 S.Ct. 450, 456, 133 L.Ed.2d 371 (1995), in which the Supreme Court held that a paid union organizer who obtained a job in order to “salt” the workforce and organize for the union was still an employee within the meaning of the National Labor Relations Act. But there, the Court noted that the employee still performed services for the benefit and under the control of the employer, even though part of his time was spent organizing for the union. That situation is different from ours. Here the chairmen do nothing for Caterpillar’s benefit.
Moreover, under Trailways we cannot conclude that the chairmen’s salaries were payments to former employees “as compensation for” their past services as employees. The chairmen were already compensated for their production line work long ago in the form of wages and vested benefits. A fair reading of Trailways does not support a finding that the payments at issue here somehow “related back” to these former employees’ services on the factory floor.
B.
Nevertheless, after careful consideration and reargument before the in banc court, we believe that Trailways was wrongly decided and tends to subject innocuous, bargained-for and fully disclosed payments to the criminal sanctions of the LMRA
We have no difficulty with the Trailways holding regarding “current employee” status. See 785 F.2d at 106-07. We also believe that the salary payments to these union officials were not in compensation for their past services rendered as production employees. Our disagreement is with the Trailways court’s conclusion that the “by reason of’ language in § 302(c)(1) exempts only those payments for past services actually rendered while the former employee was still employed by the company. We think that statement misinterprets the text of § 302(e)(1) and does nothing to further the policy objectives Congress had when it enacted the LMRA half a century ago.
The Trailways test would be quite appropriate if § 302(c)(1) referred only to payments as compensation for past services. It is difficult indeed to comprehend how years, even decades, of paid union leave can realistically be thought of as compensation for time spent on the factory floor. The Trail *-528 ways court, however, applied the same test ' to the statute’s “by reason of’ language; with that we can no longer agree.
First of all, Congress chose specifically to exempt payments in “compensation for” or “by reason of’ an employee’s service. By so doing, it must be presumed to have intended that certain payments would be legal, even though they were not, as Trailways recites, “for past services actually rendered by those former employees while they were employees of the company.” Id. at 106 (emphasis deleted). Nevertheless, the Trailways court, without any explanation, conflated the two phrases and developed a unitary test for whether former employee compensation is permissible.
Under the Trailways test, there are three requirements for a “former employee” payment to qualify for the § 302(c)(1) exemption:
(1) It must be for past, not present, services;
(2) the services must be actually rendered; and
(3) the services must have been rendered while the payee was still an employee.
Under this standard, the chairmen’s wages fail the Trailways test, because the payments are not for services actually rendered to the company while they were still employees. Indeed, under Trailways, it appears that pay or continuation of benefits for time spent serving on a jury or in the National Guard would be illegal.
Likewise, even the “no docking” provisions of many collective bargaining agreements, including the Caterpillar-UAW contract here, fail to meet the Trailways standard. Under a no-docking clause, the employer agrees that shop stewards may leave their assigned work areas for portions of a day to process employee grievances without loss of pay. By paying production workers for the part-time hours when they leave their regular duties, the company is paying for services not actually rendered for it, since those employees are already receiving their regular hourly wages and benefits for their production line work. Yet, no-docking arrangements have been consistently upheld by the courts as not in violation of § 302, see NLRB v. BASF Wyandotte Corp., 798 F.2d 849, 854-56 (5th Cir.1986); BASF Wyandotte Corp. v. Local 227, 791 F.2d 1046 (2d Cir. 1986); Herrera v. International Union, UAW, 73 F.3d 1056 (10th Cir.1996), aff'g & adopting dist. ct. analysis, 858 F.Supp. 1529, 1546 (D.Kan.1994); Communications Workers v. Bell Atlantic Network Servs., Inc., 670 F.Supp. 416, 423-24 (D.D.C.1987); Employees’ Independent Union v. Wyman Gordon Co., 314 F.Supp. 458, 461 (N.D.Ill.1970), and Caterpillar does not even seek to have the contract’s no-docking clause declared illegal. Moreover, as the union points out, it would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible, while granting a single employee eight hours per day of that same leave is. a federal crime.
We believe that the payments at issue here, while they were not compensation for hours worked in the past, certainly were “by reason of’ that service. We reach this conclusion because the payments arose, not out of some “back-door deal” with the union, but out of the collective bargaining agreement itself. Caterpillar was willing to put that costly benefit on the table, which strongly implies that the employees had to give up something in the bargaining process that they otherwise could have received. Thus, every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary.[4] As our colleague Judge Becker pointed out, dissenting in Trailways:
The collective bargaining agreement contains the terms of workers’ employment with Trailways; éach of the benefits the workers receive under that collective bargaining agreement are part of the consideration for their services at Trailways. In *-527 addition to the standard terms for wages, overtime pay, and insurance, the collective bargaining agreement provides that persons who take a leave of absence to work as union officials have a right to reinstatement at Trailways after their union service and retain their seniority during their absence. The collective bargaining agreement also provides that the employer will make payments into the union’s pension fund while the employee is on leave. Although these contributions are made during the leaves of absence, the employer’s promise to pay them is nonetheless a term of the collective bargaining agreement and therefore a part of the consideration for work performed as a Trailways employee. There is no reason for distinguishing the pension fund payments from any of the other terms of the collective bargaining agreement. Like wages, overtime, insurance, or accrued seniority, the pension fund payments are consideration for services rendered and, as such, are permissible under § 302(e)(1).
Trailways, 785 F.2d at 109 (Becker, J., dissenting).
We find this line of reasoning persuasive. Indeed, it has been taken by a number of decisions reached after Trailways. See United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir.1994) (§ 302(c)(1) satisfied when former employee’s entitlement to payments vests before he or she goes out on leave, but not after); Toth v. USX Corp., 883 F.2d 1297, 1301-04 (7th Cir.1989) (criticizing Trailways and opining that “[o]ne obvious instance in which continuing payments constitute recompense for past services is when those continuing payments were bargained for and formed part of a collective bargaining agreement.”); IBEW v. National Fuel Gas Dist. Corp., 16 Employee Benefits Cases 2018, 2020-21, 1993 WL 7541 (W.D.N.Y.1993) (same); Bell Atlantic, 670 F.Supp. at 421-22 (same). We are aware of no currently valid opinion that follows the Trailways holding.
Caterpillar maintains that, under the reasoning we have utilized, employers and unions can themselves decide what is legal regardless of federal law by agreeing in a labor contract to a particular course of conduct. Our point, however, is not that a collective bargaining agreement can immunize unlawful conduct, but that: (1) under § 302(c)(1), the lawfulness of the conduct ab initio turns on whether the payment is “owed because of ... service as an employee;” and (2) what is “owed” depends on the terms of the contract. Put differently, the contract does not immunize otherwise unlawful subjects but, by defining the basis for the payments, speaks directly to the question posed by the statute as to whether the'payments are “compensation for, or by reason of ... service as an employee.”
We also believe that any attempt to distinguish “no docking” provisions from the payments at issue here is unpersuasive. We perceive no distinction between union officials who spend part of their time (which may be quite substantial) in adjusting grievances from the type of employees who are involved here. Instead, “the nature of the absences and the payments made by the employer owning them is the same.” Trailways, 785 F.2d at 111.
III.
In sum, we simply do not view the payments at issue here as posing the kind of harm to the collective bargaining process that Congress contemplated when it enacted the LMRA. Section 302 of that statute was passed to address bribery, extortion and other corrupt practices conducted in secret. See Trailways, 785 F.2d at 110 (Becker, J., dissenting). These expanded “no-docking” provisions, in contrast, are contained in the collective bargaining agreement on which each rank-and-file employee has the opportunity to vote. Thus, the officials receiving the payments can be held accountable to the membership. See Toth, 883 F.2d at 1304. Without explicit statutory direction from Congress, we cannot condemn these payments as criminal. Accordingly, we will reverse.

. The ALJ, while questioning the validity of the payments under § 302 of the LMRA, did not reach that issue in his proposed holding.

. One issue before the court was whether the payments were lawful under § 302(c)(5), which grants an exception for payments to pension trust funds. The Trailways court concluded, however, that the § 302(c)(5) exception applies only to current employees and held that the union officials did not fit that description because Trailways did not have sufficient control over their work and because their work was solely for the benefit of the union. 785 F.2d at 104-07.

. In a footnote, the court noted that the pension contributions were based on the employees’ current union salary, indicating that the payments were “geared to their contemporaneous services to-the Union.” Id. at 106 n. 5 (emphasis deleted).

. We do not mean to imply that an employee hired after a collective bargaining agreement could not be elected chairperson because he or she never "agreed" to an implicit wage reduction. Rather, like any other term of a labor agreement, it would be binding on all employees, whenever hired, until the expiration of the contract.