Robert SIMS, Plaintiff,

v.

BOEING CO., Defendant.

No. 98–1350–JTM.

United States District Court,
D. Kansas.

July 13, 1999.

Robert Sims, Wichita, KS, pro se.

Vaughn Burkholder, Jeffrey P. DeGraffenreid, Foulston & Siefkin L.L.P., Wichita, KS, for Boeing Co.

## MEMORANDUM ORDER

MARTEN, District Judge.

Sims, a pro se plaintiff, has sued the Boeing Company ("Boeing") alleging race discrimination and breach of contract in connection with his termination on August 23, 1995. Currently before the court is Boeing's motion for summary judgment pursuant to Rule 56 and/or dismissal pursuant to Rule 12(b)(2) and 12(h). Sims has responded to Boeing's motion, and Boeing has filed a reply. For the reasons set forth below, the court finds that defendant's motion must be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## 1. Findings of Fact

Sims is a 42-year-old African-American male who worked at Boeing off and on from January 23, 1984, to August 23, 1995, when he was terminated for insubordination. While Sims worked at Boeing, he usually worked first shift, but he worked second shift several times, accumulating a period of approximately four and one-half years on second shift. Boeing pays its

employees who work second shift an additional 50 cents per hour as compared to first shift employees.

Sims was a member of an Aircraft Modification Crew in Organization Y–G263. Floyd Schuler was his supervisor. Between 15 and 25 people worked on Sims's crew, two of which are African–American—Sims and Ervin Beachum. Beachum acted as the crew's lead man.

Sims's crew was making modifications to, refurbishing, inspecting and reconditioning Aircraft 6974 under a United States Government contract. The crew began working 12–hour days, seven days a week but was still behind schedule. In early August 1995, crew members attended a meeting, and Schuler sought volunteers to move to second shift to assist in getting the modification program back on schedule. None of the crew volunteered to go to second shift. On August 10, 1995, Schuler held a second crew meeting and again asked for volunteers to go to second shift, but again, no one volunteered. Later that same day, Schuler and his manager, Ron Bergeron, selected several employees from the crew to be temporarily reassigned to second shift. Sims recalls that three employees were reassigned to second shift,[1] including himself, Leroy Tice and Terry Beardmore. Tice is a white male who had a little less seniority than Sims, and Beardmore is a white male who had a little more seniority than Sims. None of these men volunteered to move to second shift. According to Boeing, the decision regarding who should be reassigned was based on the need to have adequate experience, knowledge and certification on the second shift crew. It reassigned Sims because he had good knowledge of and experience with the aircraft. He was one of only a few people trained and Boeing-certified to work in the confined area inside the wing space, which certification was necessary for the second shift to have.

Sims acknowledges he had prior education and experience in aircraft mechanics and auto mechanics before he began his work at Boeing. He had the ability to read and apply blueprints and to work in many different areas of aircraft modification. These were abilities not all the modification mechanics in his area possessed. Sims testified he also held a variety of Boeing certifications not held by all modification mechanics, some of which are necessary to perform certain work on the aircraft.

From August 10, 1995, to August 18, 1995, Sims worked second shift. He worked overtime on some days, but not others, and did not report at all on the weekends. Members of both the first and second shifts were scheduled to work seven days per week, 12 hours per day. On Friday, August 18, 1995, Sims reported to work early on second shift so he could ask Schuler, who was still on first shift, how much longer he could be expected to work second shift. Schuler told Sims he had no idea how long he would be needed on second shift. On Monday, August 21, 1995, Sims reported to work on first shift. He had not received permission from, or even sought the approval of, anyone in management to report to first shift rather than second shift. Although Sims was a member of the International Association of Machinists local union, he did not seek the union's advice before he made his decision to report to work on first shift. Tice and Beardmore, the two non-minority employees who had been reassigned to second shift with Sims, were still working second shift when Sims "reassigned" himself to first shift. Sims is the only crew member who reassigned himself from second shift to first shift.

On August 21, 1995, the day Sims reported to first shift, personnel representative, Mark Mason, called Sims to a meeting. Sims's supervisor, Schuler, his lead

---

1. There is some dispute regarding how many employees were actually reassigned to second shift. In Schuler's affidavit, he claims eleven were reassigned, including the three Sims recalls. Schuler Aff. at 2.

man, Beachum, and Schuler's manager, Bergeron, were also present at the meeting. Mason questioned Sims about why he had reported to first shift. Sims said he had a personal situation at home—a wife, a son and a social life—that prevented him from working second shift. At the meeting, management explained to Sims that Boeing had the right to assign him to second shift. They also told him that Boeing would try to help with his situation at home but, in the meantime, they needed Sims to work second shift. They warned Sims that if he failed to report to second shift, he could be terminated. Sims understood that if he reported to work on first shift, he could be terminated for insubordination. Sims recalls he responded to the warning by telling his supervisor and manager, "you do what you have to do, that I wasn't going back on second shift." Sims Dep. at 254. Management again asked Sims if he understood what might happen if he came in to work on first shift and he replied that he did.

The next day, August 22, 1995, Sims again reported to work on first shift. He understood that this was insubordination. His supervisor and lead man took him aside and again explained he could be discharged for insubordination. On August 23, 1995, for the third day in a row, Sims reported to work on first shift in contravention of direct orders to report to second shift. Sims was terminated that morning after another meeting at which he voiced his refusal to report to his assigned shift.

Sims was a member of the Collective Bargaining Unit, the employment terms and conditions of which were controlled in 1995 by the 1992 Collective Bargaining Agreement. The portion of the 1992 Collective Bargaining Agreement relating to shift assignments states:

> The Company shall have the exclusive right to assign employees to any shift. Subject to the foregoing, senior employees who have a shift preference on file shall be given preference over other employees and new hires for placement in open job titles in their job title in their organization. If an employee does not file a shift preference, it shall be assumed that he is on his preferred shift. Under no circumstances will the provisions of this Section 5.4 be construed to enable an employee, at his instance and request, to displace a less senior employee from his job and shift.

Collective Bargaining Agreement between the Boeing Company and International Association of Machinists and Aerospace Workers, 1992, Section 5.4 ("CBA"). Article 19 of the CBA provides a procedure for the promulgation and resolution of employee grievances.[2]

Approximately one week after his termination, Sims filed a grievance with the International Association of Machinists Union regarding his termination. He testified that union representative Berlie Hale told him he could probably get reinstated, but he could not get back-pay. Sims told Hale he wanted back-pay also. This is the only conversation Sims had with anyone at the union concerning his grievance. Sims never called the union again and he claims the union never called him. Sims took no further action on his union grievance until nearly three years later, on July 26, 1998, when he filed a charge with the National Labor Relations Board ("NLRB") alleging that the union had failed to fairly represent him on his grievance. A representative of the NLRB told Sims that unless he could produce information or witnesses regarding something that had occurred within six months prior to the filing of his charge, the NLRB was going to close his case. Sims received a certified letter from the NLRB explaining to him that his complaint would be dismissed if he did not contact them about the timing of the complaint. Sims did not respond to this letter, and it is his understanding that his charge against the union has been dismissed.

---

**2.** Article 19 is set forth in the Appendix to the present memorandum.

## 2. Conclusions of Law

### A. Race Discrimination Claim

A liberal reading of Sims's complaint suggests he is pursuing a claim for race discrimination under Title VII. He claims he was denied shift preference even though the collective bargaining agreement states senior employees shall have shift preference over junior employees. He further argues that the non-minority employees who were reassigned to second shift were transferred back to first shift when they complained about working second shift.

■ To state a prima facie case of race discrimination, plaintiff must show: (1) that he is a member of a racial minority; (2) that he suffered an adverse employment action; and (3) that similarly situated non-minority employees were treated differently. *Trujillo v. University of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1212 (10th Cir.1998). To establish a case of intentional discrimination, plaintiff has two options: he may satisfy his burden of proof by offering direct evidence of discriminatory intent or he may demonstrate such intent indirectly by following the *McDonnell Douglas*[3] burden-shifting framework. *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1509 (10th Cir.1997).

■ To prevail by coming forth with direct evidence, "a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory] motive 'actually relate[s] to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace.'" *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir.1999) (quoting *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 204 (D.C.Cir.1997)); *see also Thomas v. Denny's*, 111 F.3d at 1512 (holding that plaintiff may prove discriminatory motive by "presenting 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'") (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 n. 5 (10th Cir. 1992)). Sims has not produced any direct evidence of race discrimination.

■ Because Sims is unable to show intentional discrimination directly, he must do so indirectly as set forth in *McDonnell Douglas*. Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of intentional discrimination. *Thomas*, 111 F.3d at 1509. If he meets his burden, the burden switches to the defendant to articulate a "'legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). Once the defendant has set forth a facially nondiscriminatory explanation for the decision, "the factual inquiry proceeds to a new level of specificity." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). It then becomes the plaintiff's burden to show there is a genuine dispute of material fact as to whether the employer's proffered reason for the decision is a pretext for discrimination. *Thomas*, 111 F.3d at 1509.

■ Sims can satisfy the first element of his race discrimination claim—he is a member of a racial minority. With respect to his reassignment to second shift, however, the evidence demonstrates that Sims cannot satisfy the second element of his claim, *i.e.*, that he suffered an adverse employment action. The Tenth Circuit liberally construes the phrase "adverse employment action." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* Instead, the Tenth Circuit takes a "case-by-case" approach, examining the unique factors relevant to the situation before it. *Id.* However, "'a mere inconvenience or an alteration of job responsibilities'" is not considered an ad-

---

**3.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

verse employment action. *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

Although Boeing reassigned Sims to second shift, it did not impose different responsibilities. From the information before the court, it appears Sims performed the same duties on second shift as he had on first shift. And, because he was working second shift, Boeing paid Sims 50 cents more an hour compared to those who worked the first shift. *See Bunis v. Runyon,* No. 94 Civ.2063(JFK), 1997 WL 639241, at *3 (S.D.N.Y. Oct.16, 1997) ("While Plaintiff may be unhappy about the denial of her shift change request, this Court concludes that Plaintiff's subjective feelings about the denial are not enough to transform the denial into an [adverse] employment action within the meaning of Title VII."); *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("[o]bviously, a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do either.").

To the extent Sims is alleging his termination was based on racial discrimination, he could satisfy the "adverse employment" element of his claim. However, the court finds that Sims cannot satisfy the third element—that similarly situated non-minority employees were treated differently. " 'Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.' " *Aramburu v. The Boeing Co.,*

112 F.3d 1398, 1404 (10th Cir.1997) (quoting *Wilson v. Utica Park Clinic, Inc.,* 76 F.3d 394, 1996 WL 50462 (10th Cir.1996)). There is no evidence before the court that shows similarly situated non-minority employees refused to cooperate with orders from their supervisors to report to second shift. The two non-minorities who were reassigned at the same time as Sims continued to work second shift. There was no reason for Boeing to take adverse action against them. Sims states in his complaint that in early September 1995, the two non-minority employees were reassigned to first shift after they complained about working second shift. However, by September, Boeing may have been in a position to transfer Sims back to first shift as well, had he continued to work there.

Because Sims has failed to establish a prima facie case of race discrimination, the court concludes that Boeing's motion for summary judgment must be granted with respect to this claim. Moreover, even if Sims could prove a prima facie case of race discrimination, summary judgment would be appropriate because Boeing gave legitimate, nondiscriminatory reasons for its decisions. It transferred Sims to second shift because an aircraft being modified under government contract was behind schedule and it needed qualified employees to work second shift. It later terminated Sims because of his refusal to report on his assigned shift.

### B. Breach of Contract Claim

A liberal reading of Sims's complaint indicates he is suing Boeing for its alleged failure to fulfill its obligations under the collective bargaining agreement. Sims claims the agreement required Boeing to reassign those with less seniority first. Therefore, because he had more seniority than some who were not reassigned, Boeing breached the agreement. Boeing claims that it had the exclusive right to assign employees where they were needed and that because the collective bargaining agreement provided a grievance proce-

dure, it was the exclusive and final remedy for disputes arising under it.

If a collective bargaining agreement sets forth a grievance procedure, that procedure is the exclusive and final remedy for disputes arising under that agreement. *Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). If a discharged employee "resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted." *Id.; see also United Food & Commercial Workers Local Union No. 7R v. Safeway,* 889 F.2d 940, 944 (10th Cir.1989) ("[A]n employee can only sue if he or she has exhausted any exclusive grievance procedures provided in the collective bargaining agreement.").

Section 301 of the Labor Management Relations Act provides a way in which an employee may obtain judicial review of his breach of contract claim despite his failure to secure relief through the contractual remedial procedures. 29 U.S.C. § 185(a). Section 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

*Id.* Section 301 suits, where an employee alleges that an employer has breached a collective bargaining agreement and that the union has breached its duty of fair representation, are commonly referred to as "hybrid suits." *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 530 (10th Cir. 1992). "Because most collective-bargaining agreements accord finality to grievance or arbitration procedures established by the collective-bargaining agreement, an employee normally cannot bring a § 301

action against an employer *unless* he can show that the union breached its duty of fair representation in its handling of his grievance." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (emphasis added). Whether an employee sues both the union and the employer or only one of them, he must establish two elements to recover money damages: "that the employer's action violated the terms of the collective-bargaining agreement *and* that the union breached its duty of fair representation." *Id.* (emphasis added); *see also Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) ("To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.").

A union's duty of fair representation is "inferred from unions' exclusive authority under the National Labor Relations Act (NLRA) to represent all employees in a bargaining unit." *Id.* at 563, 96 S.Ct. 1048 (citing *Vaca,* 386 U.S. at 177, 87 S.Ct. 903) (citation to statute omitted). "A union must discharge its duty both in bargaining with the employer and in its enforcement of the resulting collective-bargaining agreement." *Id.* To establish that a union has breached its duty of fair representation, employees must "show that the Union's actions were arbitrary, discriminatory or in bad faith." *Mock,* 971 F.2d at 531 (citing *Vaca,* 386 U.S. at 190, 87 S.Ct. 903).

> A union's actions are arbitrary only if, 'in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.' ... A union's discriminatory conduct violates its duty of fair representation if it is 'invidious.'

*Aguinaga v. United Food & Commercial Workers Int'l Union,* 993 F.2d 1463, 1470

(10th Cir.1993) (quoting *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 67 & 81, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)). "Bad faith requires a showing of fraud, deceitful action or dishonest action. Simply showing that the union did not represent them as vigorously as it could have does not establish a section 301 violation." *Mock,* 971 F.2d at 531 (citation omitted). Similarly, "[a]cts by the union which are merely negligent do not state a claim for breach of a duty of fair representation." *Nelson v. Holmes Freight Lines,* 37 F.3d 591, 594 (10th Cir.1994) (citing *United Steelworkers of Am., AFL–CIO–CLC v. Rawson,* 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990)).

 "In *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 154–55, 103 S.Ct. 2281, 2285, 76 L.Ed.2d 476 (1983), the Supreme Court held that the six-month statute of limitations prescribed by section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), applies to hybrid suits under section 301." *Lucas v. Mountain States Tel. & Tel.,* 909 F.2d 419, 420 (10th Cir.1990). At what point the six-month period begins to run depends on the context. When a union rejects or abandons the claims of an aggrieved employee, "the six-month limitation period begins to run when the employee knows or, through the exercise of reasonable diligence, should have known of that union's decision or action." *Id.* at 421. "[W]hen a union represents an employee throughout a grievance procedure, a claim challenging the adequacy of that union's representation normally does not accrue until the dispute resolution process has been completely exhausted." *Id.* "Similarly, in duty-of-fair-representation cases in which the alleged breach of duty arises outside the context of processing a grievance, ... accrual of such a claim can be tolled by an employee's good faith attempt to exhaust the grievance procedures." *Id.* at 421–22. The current case is an illustration of the first type of case, that is, when the union abandons the employee's claim. "Thus, the decisive issue here is whether [Sims] knew or should have known of the Union's decision more than six months before this action was brought." *Id.* at 422. Sims clearly would have known of the union's decision not to pursue the claim more than six months before this action was brought. This case was not filed until August 1998, three years after Boeing terminated Sims. Sims claims he contacted the union representative about his termination within a week after his termination. Here, the union abandoned Sims's complaint because he showed no interest in pursuing it once the representative told him he could not get back-pay. Sims knew or at least should have known about the union's decision long before he filed this lawsuit.

 If the collective bargaining agreement in this case does provide a grievance procedure, as Boeing claims, then Sims's contract claim fails. There is some evidence that he attempted to pursue his claim through the union representatives within a week or so of his termination, but once they told him he could not get back-pay, he no longer pursued his claim. The court cannot conclude that the union had an obligation to pursue the claim once Sims showed no interest in pursuing it himself. The only way Sims could overcome Boeing's defense that he did not exhaust his contractual remedies is for him to pursue a claim under Section 301. Such an action, however, would face several problems. First, as discussed above, the claim would be barred by the six-month statute of limitations. Second, there is no evidence to support a finding that the union acted arbitrarily, discriminatorily or in bad faith. In other words, the evidence before the court would not support any finding that the union breached its duty to Sims. Further, Sims has not alleged in his complaint that the union breached its duty to him. Finally, the evidence establishes that Boeing did not breach the collective bargaining agreement, which clearly gives the company "the exclusive right to assign employees to any shift." CBA at § 5.4.

IT IS ACCORDINGLY ORDERED this 13th day of July, 1999, that the defendant's motion for summary judgment (Dkt. No. 24) is hereby granted.

## APPENDIX

## COLLECTIVE BARGAINING AGREEMENT

## ARTICLE 19

## GRIEVANCE PROCEDURE AND ARBITRATION

**Section 19.1 Establishment of Grievance and Arbitration Procedure.**

Grievances or complaints arising between the Company and its employees subject to this Agreement, or the Company and the Union, with respect to the interpretation or application of any of the terms of this Agreement, shall be settled according to the following procedure. Subject to the terms of this Article 19 relating to cases of dismissal or suspension for cause or of involuntary resignation, only matters dealing with the interpretation or application of terms of this Agreement shall be subject to this grievance machinery.

**Section 19.2 Employee Grievances.**

In the case of grievances on behalf of employees and subject to the further provisions of Section 19.3 below, relating to cases of layoff or dismissal or suspension for cause or involuntary resignation:

**STEP 1. Oral Discussion.** The employee first shall notify his supervisor of his grievance and then, if he so desires, shall discuss his grievance with the steward or the Union business representative, and if the steward or the business representative considers the grievance to be valid, then the employee and the steward or business representative will contact the employee's supervisor and will attempt to effect a settlement of the complaint. This procedure, however, will not prevent an employee from contacting his supervisor if he so chooses. If the purpose of the employee's contacting his supervisor is to adjust the grievance, the steward or the business representative shall be given an opportunity to be present and such adjustment shall be in conformity with this Agreement.

**STEP 2. Grievance Reduced to Writing—Handling at Supervisory Level.** If no settlement is reached in Step 1, the business representative, if he considers the grievance to be valid, may at any time reduce to writing a statement of the grievance or complaint which shall contain the following:

(a) The facts upon which the grievance is based.

(b) Reference to the section or sections of the Agreement alleged to have been violated (this will not be applicable in cases of dismissal or suspension for cause or of involuntary resignation).

(c) The remedy sought.

The business representative shall submit the written statement of grievance to the supervisor for reconsideration, with a copy to the designated representative of the Company. After such submission the supervisor and the business representative may, within the next five (5) workdays (unless mutually extended), settle the written grievance and, over their signatures, indicate the disposition made thereof. Otherwise, promptly after the expiration of such five-day, period (or agreed extension thereof) the supervisor and the business representative shall sign the grievance and their signatures will indicate that the grievance has been discussed and reconsidered by them and that no settlement has been reached.

**STEP 3. Written Grievance; Handling at Business Representative–Company Representative Level.** If no settlement is reached in Step 2, within the specified or agreed time limits, the business representative may at any time thereafter submit the grievance to the designated representative of the Company. After such submission the designated representative of the Company and the business representative may, within the next ten (10) workdays (unless mutually ex-

tended), settle the grievance and, over their signatures, indicate the disposition made thereof. Otherwise, promptly after the expiration of such ten-day period (or agreed extension thereof) the designated representative of the Company and the business representative shall sign the grievance and their signatures will indicate that the grievance has been discussed and reconsidered by them and that no settlement has been reached. **STEP 4. Arbitration.** If no settlement is reached in Step 3 within the specified or agreed time limits, then either party may in writing, within ten (10) workdays thereafter, request that the matter be submitted to an arbiter for a prompt hearing as hereinafter provided in Sections 19.6 to 19.9, inclusive.

### Section 19.3 Dismissals, Suspensions, Layoffs, Etc.

In cases of layoff or of dismissal or suspension for cause, or of involuntary resignation, the employee shall be given a copy of the layoff, suspension or termination of service slip, as the case may be, if he is available to be presented with such copy. If he is not available, copies of the slip will be sent to the employee and to the Union office. The employee shall have the right to appeal the action shown on the slip providing the business representative files a written grievance with the designated representative of the Company within seven (7) workdays after the date of layoff, dismissal, suspension for cause or involuntary resignation, or within seven (7) workdays after the date of the mailing of the copy of the slip, provided, however, that any dismissal or suspension of an employee who has committed a sex crime victimizing a child or children shall be deemed to be for cause and shall not be subject to the grievance and arbitration procedure of this Article 19. The written grievance then may be processed through subsequent steps.

### Section 19.4 Union Versus Company and Company Versus Union Grievances.

In the case of any grievance which the Union may have against the Company or the Company may have against the Union, the processing of such grievance shall begin with Step 3 and shall be limited to matters dealing with the interpretation or application of terms of this Agreement. Such grievance shall be submitted in writing to the designated representative of the Company or the designated representative of the Union, and shall contain the following:

19.4(a) Statement of the grievance setting forth the facts upon which the grievance is based.

19.4(b) Reference to the section or sections of the Agreement alleged to have been violated.

19.4(c) The correction sought.

The grievance shall be signed by the designated representative of the Union or the designated representative of the Company. If no settlement is reached within ten (10) workdays (unless mutually extended) from the submission of the grievance to the designated representative of the Company or the designated representative of the Union, as the case may be, both shall sign the grievance and indicate that it has been discussed and reconsidered by them and that no settlement has been reached. Within ten (10) workdays thereafter either party may in writing request that the matter be submitted to an arbiter for a prompt hearing as hereinafter provided in Sections 19.6 to 19.9, inclusive.

### Section 19.5 Retroactive Compensation.

Grievance claims involving retroactive compensation shall be limited to thirty (30) calendar days prior to the written submission of the grievance to Company representatives, provided, however, that this thirty-day limitation may be waived by mutual consent of the parties.

### Section 19.6 Selection of Arbiter—By Agreement.

In regard to each case reaching Step 4, the parties will attempt to agree on an arbiter to hear and decide the particular case. If the parties are unable to agree

to an arbiter within ten (10) workdays after submission of the written request for arbitration, the provisions of Section 19.7 (Selection of Arbiter—From Arbitration Panel) shall apply to the selection of an arbiter.

### Section 19.7 Selection of Arbiter— From Arbitration Panel.

Immediately following execution of this Agreement the parties will proceed to compile a list and agree upon two (2) separate panels of arbiters. One such panel shall be referred to as the Seattle–Renton–Portland Panel, and the other shall be referred to as the Wichita Panel. The Seattle–Renton–Portland Panel shall be comprised of five (5) arbiters, and the Wichita Panel shall be comprised of two (2) arbiters. Insofar as practicable the arbiters on each panel shall be located in the general vicinity of the location identified with the title of their panel. If a case reaches Step 4, and the parties are unable to agree to an arbiter within the time limit specified in Section 19.6, the case shall be heard and settled by an arbiter on the panel geographically identified with the grievance, if available. An available arbiter is one who is available to conduct a hearing within sixty (60) days (unless mutually extended) after expiration of the time limit specified in Section 19.6. Selection of an arbiter from the Seattle-Renton-Portland Panel to hear a particular case shall be accomplished by the parties taking turns in striking a name from the panel until one (1) name remains. The arbiter whose name remains shall be the arbiter for that case. The right to strike first shall be determined by lot. Assignment of cases to arbiters on the Wichita Panel shall be rotated in the alphabetical order of the last names of those available on the panel.

### Section 19.8 Procedure Where Corporate Panel Arbiter Not Available.

In the event as to any case, that there is no available arbiter on the applicable Corporate Panel, the parties shall jointly request the American Arbitration Association to submit a panel of seven (7) arbiters.

Such request shall state the general nature of the case and ask that the nominees be qualified to handle the type of cases involved. When notification of the names of the panel of seven (7) arbiters is received, the parties in turn shall have the right to strike a name from the panel until only one (1) name remains. The remaining person shall be the arbiter. The right to strike the first name from the panel shall be determined by lot.

### Section 19.9 Arbitration—Rules of Procedure.

Arbitration pursuant to Step 4 shall be conducted in accordance with the following:

19.9(a) The arbiter shall hear and accept pertinent evidence submitted by both parties and shall be empowered to request such data as he deems pertinent to the grievance and shall render a decision in writing to both parties within fifteen (15) days (unless mutually extended) of the completion of the hearing.

19.9(b) The arbiter shall be authorized to rule and issue a decision in writing on the issue presented for arbitration, which decision shall be final and binding on both parties.

19.9(c) The arbiter shall rule only on the basis of information presented in the hearing before him and shall refuse to receive any information after the hearing except when there is mutual agreement, in the presence of both parties.

19.9(d) Each party to the proceedings may call such witnesses as may be necessary in the order in which their testimony is to be heard. Such testimony shall be limited to the matters set forth in the written statement of grievance. The arguments of the parties may be supported by oral comment and rebuttal. Either or both parties may submit written briefs within a time period mutually agreed upon. Such arguments of the parties, whether oral or written, shall be confined to and directed at the matters set forth in the grievance.

**19.9(e)** Each party shall pay any compensation and expenses relating to its own witnesses or representatives.

**19.9(f)** The Company and the Union shall, by mutual consent, fix the amount of compensation to be paid for the services of the arbiter. The Union or the Company, whichever is ruled against by the arbiter, shall pay the compensation of the arbiter including his necessary expenses.

**19.9(g)** The total cost of the stenographic record (if requested) will be paid by the party requesting it. If the other party also requests a copy, that party will pay one-half of the stenographic costs.

## Section 19.10 Extension of Time Limits by Agreement.

Time limits designated in this Article 19 for processing grievances and for bringing a matter to arbitration may only be extended by mutual written consent.

## Section 19.11 Agreement Not to Be Altered.

In arriving at any settlement or decision under the provisions of this Article 19, neither the parties nor the arbiter shall have the authority to alter this Agreement in whole or in part.

## Section 19.12 Conferences During Working Hours.

All conferences resulting from the application of provisions contained in this Article 19 shall be held during working hours.

## Section 19.13 Business Representative, When Not Available, May Authorize Designee.

For any period that the business representative is unavailable to serve in that capacity under this Article 19, he may designate an accredited steward or another accredited business representative to act for him, as his designee. As to each such period of unavailability, authorization of the designee will be accomplished by the business representative informing the appropriate Company representative of the expected period of the business representative's unavailability and naming the designee. When the business representative again is available to perform his duties under this Article 19, he shall promptly notify the Company representative of the fact and such notice will terminate the period during which the designee is authorized to act.

## Section 19.14 Signing Grievance Does Not Concede Arbitrable Issue.

The signing of any grievance by any employee or representative either of the Company or of the Union shall not be construed by either party as a concession or agreement that the grievance constitutes an arbitrable issue or is properly subject to the grievance machinery under the terms of this Article 19.

## Section 19.15 Union Jurisdictional Claims.

Union jurisdictional claims arising under the provisions of Section 1.3 of this Agreement, except those identified in Section 1.3(f), shall be handled pursuant to the provisions of Section 19.4 and 19.6 through 19.14, inclusive, except that the following requirements shall apply:

**19.15(a)** The written statement of grievance shall identify the job involved, state the Union's contention or contentions in detail, and shall contain a detailed statement of the reasons for the position taken by the Union.

**19.15(b)** If the Company and the Union are unable to agree upon the contents and scope of the record to be presented to the arbiter, either party may present to the arbiter whatever evidence, testimony and written argument it deems relevant to the question to be submitted to the arbiter. A written summary of such evidence, testimony and written argument will be submitted to the other side at least ten (10) days in advance of the hearing.

**19.15(c)** If the parties are unable to agree upon the question that it is to be submitted to the arbiter for decision, the

question to be submitted to, and answered by, the arbiter shall be:

"On the basis of the evidence, information, and arguments submitted by the parties in reference to the Union's contention in this case, is the Company violating Article 1, Section 1.1, paragraph 1.1(a), 1.1(b), 1.1(c), or 1.1(d)?"

**19.15(d)** The arbiter shall answer the question submitted to him under 19.15(c) or the agreed statement of the issue presented by both parties. The arbiter's answer shall either be in the affirmative or the negative. The arbiter shall confine the proceedings before him to the questions presented to him in accordance with this Section 19.15 and he shall not have authority to specify any change in a job or any change in the work assignments under a job or the creation of a new job or any other remedy or type of award.

**19.15(e)** If the arbiter's answer sustains the Union's contention, the Company shall, within thirty (30) days (or any longer period to which the parties may mutually agree) after receiving the arbiter's decision, take whatever corrective action is necessary to eliminate the basis for the Union's jurisdictional claim in the particular case.

**19.15(f)** Any resolution of any claim or controversy under Section 1.3, whether by mutual agreement or by arbitration, that requires corrective action on the part of the Company shall be prospective in effect from the date of the corrective action taken by the Company.