Sondra **HARTWICK**, James Jacobo, Stan Knipp, Ronald M. Knox, Dennis Mathews, Margarette S. Petrie, and Leroy Quade, Plaintiffs,

v.

**DISTRICT LODGE 70, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Local Lodge 2328, International Association of Machinists and Aerospace Workers, and Raytheon Aircraft Company, Defendants.**

No. 99–4139–SAC.

United States District Court, D. Kansas.

Nov. 6, 2001.

William G. Haynes, Frieden, Haynes & Forbes, Topeka, KS, Tarry D. Criss, Hampton & Royce, L.C., Salina, KS, for plaintiffs.

Thomas E. Hammond, Hammond, Zongker & Farris, L.L.C., Wichita, KS, for Lodge 70 Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO, Local 2328

Intern. Ass'n of Machinists and Aerospace Workers, AFL/CIO, defendants.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., Wichita, KS, Kathryn Gardner, Topeka, KS, for Raytheon Aircraft Corp., defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

■ The case comes before the court on the defendant Raytheon Aircraft Company's (RAC's) Amended motion for summary judgment. (Dk.85). As current or retired hourly employees of the defendant company, the plaintiffs worked at RAC's plant in Salina and were represented by the District Lodge 70, International Association of Machinists and Aerospace Workers and its Local Lodge 2328 ("IAM" or "Union"). The plaintiffs brought this action under the Labor Management Relations Act, 29 U.S.C. § 185, against RAC and the Union alleging breach of the collective bargaining agreement ("CBA") and breach of the duty of fair representation. By subsequent stipulation, the plaintiffs dismissed with prejudice their claims against the Union. The plaintiff's only remaining claim is against the defendant employer alleging it breached the CBA by not permitting them to work overtime in Raytheon Aircraft Parts Inventory and Distribution ("RAPID") Department 505. The defendant RAC requests oral argument on its motion. The court denies this request, as oral argument would not materially assist the court in deciding the issues presented in the parties' filings.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only if the record demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted).

## STATEMENT OF UNCONTROVERTED FACTS

1. RAC manufactures and sells aircraft for general and military use. It also manufactures spare parts for the aircraft it manufactured. For many years, RAC's Department 761 in Salina, Kansas, handled some of the spare parts distribution work. As a result of some corporate purchases and mergers, RAC's parts distribution operations occurred at multiple sites and involved different systems and procedures. To consolidate and improve the efficiency of these operations, RAC in 1996 created a single subsidiary company, Raytheon Air-

craft Parts Inventory and Distribution ("RAPID"), to handle the distribution of spare aircraft parts.

2. The plaintiffs are employed with RAC or have retired while this suit has been pending. All of the plaintiffs did spare parts work at RAC's plant in Salina, Kansas. After the creation of RAPID, plaintiffs and other employees in RAC's Department 761 became RAPID employees and part of RAPID Department 505. Their transfer to RAPID Department 505 was effective December 30, 1996.

3. RAPID is a separate corporation from RAC and has its own payroll and accounting system. When they worked for RAPID, the plaintiffs received paychecks and W–2 statements from RAPID, not RAC.

4. RAC and RAPID employees have been permitted transfers between companies without interviews. Employees also have been loaned between companies on a full-time basis. When RAPID outsources its work, its employees are allowed to transfer to available positions in RAC. Lacking its own human resources department, RAPID relies on RAC's human resources department and is assessed a charge for those services through a budgetary allocation. When some of RAPID's operations were outsourced, RAC management were involved in making this announcement.

5. Plaintiffs worked in RAPID Department 505 from December 30, 1996, to September 29, 1997. Some of the work done in that department was the assembly of kits made up of all parts needed for certain aircraft repairs. Because of a shortage of employees and an abundance of work, those employees assigned to Department 505 could work as much overtime as they wanted. An employee receives one and one-half to two times the employee's normal hourly rate for overtime work.

6. In the fall of 1997, it was decided to move the assembly of kits work back to RAC with eleven jobs created in a new RAC Department 784 for doing this work. Employees in RAPID Department 505 were given the option by seniority to remain with Department 505 or to transfer to RAC Department 784. Some decided to make the transfer, as they liked working with kits, they thought the kit work was easier, they wanted to avoid RAPID Department 505's anticipated move from Salina, and/or they did not want to lose their crew chief position. Prior to taking the transfer to RAC Department 784, the plaintiffs did not inquire whether they would still be permitted to work overtime in RAPID Department 505. Some of the plaintiffs were fairly certain that this overtime work would not be allowed and transferred anyway.

7. On September 29, 1997, each of the plaintiffs transferred from RAPID Department 505 to RAC Department 784 where they continued performing essentially their same work, namely the assembly of kits.

8. After their transfers, the plaintiffs wanted to work their regular shifts in RAC Department 784 and then work overtime in RAPID Department 505. This was discussed with Ron Jones, the section manager for RAPID, who needed persons to work overtime and told the plaintiffs that he had no objection to them coming in and working overtime. The plaintiffs spoke with their union steward, Tom Muhleheisen, who said he did not have a problem with them working overtime in Department 505.

9. In January or February of 1998, the plaintiffs learned that they would not be allowed to work overtime in RAPID Department 505. Terry Cleveland, the plant chair for IAM, told plaintiffs that the overtime issue was a determination for management which had decided not to allow it

in this situation. Specifically, the plaintiffs were told that working their regular hours for RAC and then overtime rate hours for RAPID would create accounting problems for the separate companies. The plaintiffs discussed with union officials the value of filing a grievance and were told essentially that they lacked grounds for filing one.

10. The plaintiffs admit knowing that overtime was a matter left to management's discretion and that no one with management had promised or guaranteed them any overtime work.

11. Since 1939, the IAM and RAC have been parties to a collective bargaining agreement ("CBA"). The particular CBA at issue here was effective from August 5, 1996, through August 5, 2001. Employees of RAPID who hold bargaining unit jobs, including the plaintiffs, are covered by the CBA. The overtime provisions are found at Article IV, pages four through eight, of the CBA, which state in relevant part:

All overtime shall be divided as equitably as practical on a calendar year basis as follows:

First, overtime will be divided among crews of qualified employees doing the same or similar work.

Secondly, the Steward and Section Manager may mutually agree to divide overtime among other established groups of qualified employees.

Overtime records will be reviewed on a quarterly basis by the Section Manager and the Union Steward.... The Steward and the Section Manager will determine if the overtime distribution has been basically satisfactory for the period reviewed. If the distribution is satisfactory, the records, in effect, will be considered closed at that point, even though there may be a variation of the amount of overtime charged to the different employees involved....

If the conclusion of the Section Manager and the Steward is the overtime distri-

bution for the period reviewed is not basically satisfactory, the Section Manager and Steward will agree on a procedure and possible action to be taken to bring the overtime distribution into a more satisfactory condition....

. . . . .

The following guidelines should be followed by the Section Manager and Steward when considering their review of the distribution of overtime:

In the assignment of overtime, employees assigned must be qualified to perform the work.

Employees performing the assignment during the normal workweek will normally work the overtime required at the end of, or prior to, the regular shift. Overtime will be performed by qualified employees in the department on the basis of "their turn" in the interest of equalizing overtime when overtime is scheduled at a time other than the end of, or prior to, an employee's regular shift.

(b) If there are an insufficient number of qualified employees willing to work the overtime, the overtime shall be worked by the junior qualified employees in the department and shift.

(Dk.87, Ex. 2, pp. 5–6). The CBA further provides "that the Company has and will retain the unquestionable and exclusive rights and power to manage the plant and direct the working forces" and that "[a]ll matters which are not specifically covered by this Agreement are solely functions and responsibilities of Management." *Id.* at p. 68.

12. Article VIII of the CBA addresses grievances and requires:

**Section 1.** An employee having a grievance against the Company with respect to the interpretation or application of this Agreement shall, personally, or

through the steward of the department on the shift to which the employee is assigned, present such grievance to the employee's immediate supervisor within three (3) workdays following date of discovery of the incidents which occurred that are the subject of the grievance.... All grievances shall be in writing and state in detail the facts complained of and the provisions of the Agreement which are deemed to have been violated....

. . . . .

**Extensions may be granted when requested by either party on a timely basis.** In the event grievances or arbitrations are not filed or processed in the manner and within the times set forth above, they shall be forever barred.

(Dk. 87, Ex. 2, pp. 30 and 34).

13. The plaintiffs did not file any grievances over being denied the opportunity to work overtime in RAPID Department 505 while regularly employed and working in RAC Department 784.

14. In March of 1999, IAM and RAC officials executed a final version of an Administrative Agreement regarding the "Seniority of Departments 505 and 784" which provides:

This will formalize the understanding reached at the time kits were moved from Customer Support to Production. It was agreed that Department 505 and Department 784 would be considered as one for the purposes of layoff and recall.

It was understood and agreed that the above is applicable only to those employees in Department 505 on or before September 29, 1997. Any employee hired or transferred into Department 505 or Department 784 after September 29, 1997, shall establish seniority only in the department to which they are hired or transferred and shall not establish seniority rights in the other departments. (Dk.90, Ex. A).

15. RAC's Louise Lagerman drafted a memorandum dated June 11, 1999, that contemplated former RAPID employees working overtime in RAPID's Department 505. There is no evidence that this memorandum received management approval and then was circulated and implemented.

## GOVERNING LAW AND ANALYSIS

■ There is no dispute that the plaintiffs' claims are a "hybrid" action brought pursuant to Section 301 of the Labor Management Relations Act ("LMRA"). In a line of decisions, most notably *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 153–64, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court has recognized:

[W]hen the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation ..., an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding.

*DelCostello*, 462 U.S. at 164, 103 S.Ct. 2281 (citations omitted). This kind of suit brought under § 301 has been labeled a "hybrid" action:

because it combines two conceptually independent causes of action, the first against the company for breach of the contract (a standard § 301 claim) and the second against the union for breach of the duty of fair representation (a claim implied by operation of a union's status under federal law as the sole bargaining representative of the employee).

*Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1238 (10th Cir.1998), *cert. de-*

*nied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). "The 'hybrid' suit is a judicially created exception to the general rule that an employee is bound by the result of grievance or arbitration remedial procedures provided in a collective-bargaining agreement." *Edwards v. International Union, UPGWA,* 46 F.3d 1047, 1051 (10th Cir.) (citation omitted), *cert. denied,* 516 U.S. 811, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995). The employee's unfair representation claim against the union and the breach of contract claim against the employer are "inextricably interdependent." *DelCostello,* 462 U.S. at 164–65, 103 S.Ct. 2281 (citations omitted). "This is true regardless of whether the employee sues the employer, the union, or both." *Edwards,* 46 F.3d at 1051.

### Statute of Limitations

■■ To preserve hybrid § 301 claims for breach of contract and duty of fair representation, a plaintiff must file suit within six months of when his cause of action accrued. *DelCostello,* 462 U.S. at 170–72, 103 S.Ct. 2281. The six-month statute of limitations applies "to both elements of a 'hybrid' claim under *DelCostello.*" *Edwards,* 46 F.3d at 1052. Absent a meritorious summary judgment motion, the timeliness of an action is for the jury to decide by a preponderance of the evidence. *See Aguinaga v. United Food & Com. Workers Intern.,* 993 F.2d 1463, 1472 (10th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). "[T]he separate causes of actions in a hybrid § 301/fair representation claim accrue simultaneously." *Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235, 1239 (6th Cir.), *cert. denied,* 510 U.S. 827, 114 S.Ct. 92, 126 L.Ed.2d 60 (1993); *see Arnold v. Air Midwest, Inc.,* 877 F.Supp. 1452, 1466 (D.Kan.1995) (citing *Trial v. Atchison, Topeka & Santa Fe Ry. Co.,* 896 F.2d 120 (5th Cir.1990) "(district court does not have jurisdiction over company portion of plaintiff's hybrid claim where union portion of plaintiff's hybrid claim is barred by statute of limitations).", *aff'd,* 100 F.3d 857 (10th Cir.1996).

■■ The limitations period "begins to run when the employee 'knows or in the exercise of reasonable diligence should have known or discovered the acts constituting the union's alleged violations.'" *Edwards,* 46 F.3d at 1053 (quoting *Lucas v. Mountain States Telephone & Telegraph,* 909 F.2d 419, 420–21 (10th Cir. 1990)). Factoring in the separate causes of action, the rule can be stated as "'the timeliness of the suit must be measured from the date on which the employee knew or should have known of the union's final action or should have known of the employer's final action, whichever occurs later.'" *Robinson,* 987 F.2d at 1239 (quoting *Proudfoot v. Seafarer's International Union,* 779 F.2d 1558, 1559 (11th Cir. 1986)). When the union abandons or rejects an aggrieved employee's claims during the grievance process, the limitation period commences "when the employee knows or, through the exercise of reasonable diligence, should have known of that union's decision or action." *Lucas,* 909 F.2d at 421 (citations omitted).

■ Viewing the evidence in the light most favorable to the plaintiff, they knew no later than February of 1998 that RAC's management had decided not to allow them to work overtime hours in RAPID Department 505 because the management considered RAPID and RAC to be separate companies and because working overtime for RAPID would create accounting problems for the two companies. The plaintiffs promptly went to see union officials about pursuing a grievance and were told that this overtime issue was a determination reserved for RAC's management, that the plaintiffs had no basis for filing a grievance, and that the union was not open

to assisting them. Despite this knowledge, the plaintiffs did not file their lawsuit until September 17, 1999, more than sixteen months later.

The plaintiffs contend they did not know of their "claim until they discovered that RAPID and RAC were not as separate as both RAC and the Union had led them to believe." The plaintiffs point to different facts that show the interrelatedness of RAC and RAPID and single out the Administrative Agreement as the most important fact showing the companies were not operated as legally separate companies. What the plaintiffs fail to explain is how the lack of factual support for RAC's explanation for denying them overtime work is what gives rise to their breach of contract claim. Elsewhere in their brief, the plaintiffs assert the CBA "provides that overtime is to be divided among crews of qualified employees doing the same or similar work." (Dk.90, p. 11). Moreover, the "[p]laintiffs assert that nothing in the CBA prohibits employees of one company from working overtime for 'another affiliated company.'" (Dk.90, p. 12). Nothing prevented the plaintiffs from making these same contentions or allegations in 1998 whether or not they learned additional facts about the closeness between RAC and RAPID.

Even assuming for the sake of argument that the relationship between RAC and RAPID has some relevance to their breach of contract claim, the plaintiffs are really in no position to claim they were reasonably diligent in February of 1998 in not questioning, investigating and challenging the separateness of the companies or the ability of the companies to deal with accounting issues between them. They had worked in both departments and received separate paychecks from RAPID while employed with RAPID. They knew that RAC created RAPID as a separate company and its stated reasons for doing this.

They witnessed the close interaction between the companies when they transferred from RAPID to RAC and observed other employees transferring between the two companies. They knew that RAC's management was closely involved in the creation and management of RAPID. Under these circumstances, the plaintiffs should have known as of February 1998 that they could factually question the legal separateness of the companies as a business justification for denying them overtime. The terms of the Administrative Agreement may be more evidence of that close relationship but they simply are not the first time that the plaintiffs had reason for questioning the legal separateness of the companies. Indeed, the Administrative Agreement treats the two departments as one for the limited purpose of determining seniority rights of those employees in Department 505 prior to September 29, 1997. It does not speak to treating the departments as one for any other purpose, including the assignment and availability of overtime work. In short, the plaintiffs are unable to create a genuine issue of material fact that they did not know and, with reasonable diligence, could not have known of their alleged breach of contract claim until they learned the terms of the Administrative Agreement.

■■■ The plaintiffs have not come forward with any persuasive facts for tolling the limitations period. "[I]n ... cases in which the alleged breach of duty arises outside the context of processing a grievance, courts have held that accrual of such a claim can be tolled by an employee's good faith attempt to exhaust the grievance procedures." *Lucas*, 909 F.2d at 421–22. The limitation period, however will not be tolled when the "employee is inexcusably dilatory with regard to the pursuit of his or her grievance." *Herrera*

*v. International Union, United Auto. Aerospace and Agr. Implement Workers of America,* 858 F.Supp. 1529, 1541 (D.Kan. 1994) (citation omitted), *aff'd,* 73 F.3d 1056 (10th Cir.1996). The court concludes that the plaintiffs here did not in good faith even attempt to exhaust the grievance procedures and whatever efforts they made in pursuing a grievance do not qualify as diligent under the circumstances. By the terms of the CBA, the plaintiffs could bring their grievances individually without the Union's assistance. In choosing not to do so and relying instead on the Union's general opinion on the apparent merits of their intended grievance, the plaintiffs did not file a grievance in good faith and did not pursue the same with diligence.

 The plaintiffs allege "that RAC and the Union misled and deceived" them about the relationship between RAC and RAPID in denying them the overtime hours. To sustain a claim of equitable tolling based on fraudulent concealment, a plaintiff must prove: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Noble v. Chrysler Motors Corp., Jeep Div.,* 32 F.3d 997, 1001–02 (6th Cir.1994) (citation omitted). The plaintiffs have not come forth with the facts on which a reasonable jury could find fraudulent concealment. Other than the terms of the Administrative Agreement, the plaintiffs have not alleged any facts that would prove their failure to discover the basis of their cause of action. As stated above, the terms of the Administrative Agreement add little or nothing to the mixture of facts already known by the plaintiffs about the CBA and their alleged rights to work overtime in RAPID Department 505. The plaintiffs have offered nothing to show their due diligence in discovering the basis of their claim. The court finds no basis on the record for a reasonable factfinder to conclude that the statute of limitations should be equitably tolled.

 The plaintiffs argue that RAC's ongoing refusal to allow them overtime work in RAPID 505 constitutes a continuing violation. The court simply is not persuaded that the continuing violations doctrine applies here. *See Tapia v. Local 11 Hotel Employees,* 2001 WL 630260 at *1 (9th Cir. Jun.4, 2001) (Table) (citing *Harper v. San Diego Transit Corp.,* 764 F.2d 663, 669 (9th Cir.1985) ("This continuing breach theory finds no support in the case law, and it contradicts one of the premises of the hybrid § 301 lawsuit.")). The fact that overtime work was available but not allowed the plaintiffs during the limitations period is irrelevant. What the plaintiffs are complaining about is RAC's enforcement of the overtime provisions in the CBA and the union's interpretation of the same, all of which was finally decided and announced well outside the six-month period. The Seventh Circuit recently observed:

> A continuing violation requires unlawful acts to occur within the limitations period. *See Local No. 1424, Int'l Ass'n of Machinists v. NLRB,* 362 U.S. 411, 422, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). As the Supreme Court has explained, there is no continuing violation sufficient to delay the statute of limitations if the conduct within the six month period is only unlawful in light of conduct outside of the six month period. *Id.; Ray Lewis v. Local Union 100,* 750 F.2d 1368, 1369 (7th Cir.1984). The company's failure to pay her a higher amount each pay period is not a new violation, but the result of the fact that she did not receive credit for her training when she claims to have earned it in 1991. *See Dasgupta v. University of Wisconsin Board of Re-*

*gents,* 121 F.3d 1138, 1140 (7th Cir.1997) (in Title VII context, distinguishing between continuing unlawful acts and the lingering effect of an unlawful act; only the former establish a continuing violation). *See Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 1001 (6th Cir.1994) (citing *Metz,* 715 F.2d at 306) (Company's firing of plaintiff based on seniority during limitations period was not continuing violation of its earlier, allegedly wrongful, denial of plaintiff's seniority status).

*Christiansen v. APV Crepaco, Inc.,* 178 F.3d 910, 915, 916 (7th Cir.1999). For that matter, "continued union inactivity after an initial failure to respond to a grievance request does not constitute a continuing violation of the duty of fair representation." *Id.* at 916 (quoting *Adams v. Budd Co.,* 846 F.2d 428, 431 (7th Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989)). Consequently, an employer's failure to recognize an employee's right to work overtime and the union's failure to respond to the employee's grievance about the same are not continuing violations. *See Casteel v. Dominick's Finer Foods,* 2000 WL 688951, at *6 *8 (N.D.Ill. Apr.19, 2000). Unable to come forth with any facts to avoid the limitations bar, the plaintiffs' claims are subject to summary judgment.

### Breach of Duty of Fair Representation

 "A breach of the duty of fair representation occurs when the union's conduct toward the employee is 'arbitrary, discriminatory, or in bad faith.'" *Nelson v. Holmes Freight Lines, Inc.,* 37 F.3d 591, 594 (10th Cir.1994) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). The Tenth Circuit has described "arbitrary" and "discriminatory" in these terms:

A union's actions are arbitrary only if, 'in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.' ... A union's discriminatory conduct violates its duty of fair representation if it is 'invidious.'

*Aguinaga v. United Food & Com. Workers Intern.,* 993 F.2d at 1470 (quoting *Air Line Pilots Ass'n Int'l. v. O'Neill,* 499 U.S. 65, 67, and 81, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)); *see Sims v. Boeing Co.,* 60 F.Supp.2d 1220, 1228 (D.Kan.1999), *aff'd,* 215 F.3d 1337, 2000 WL 633228 (10th Cir. 2000) (Table). "Bad faith requires a showing of fraud, deceitful action or dishonest action. Simply showing that the union did not represent them as vigorously as it could have does not establish a section 301 violation." *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992). (citation omitted). "Acts by the union which are merely negligent do not state a claim for breach of a duty of fair representation." *Nelson,* 37 F.3d at 594. This court is not to "substitute for our own the Union's good faith, nondiscriminatory judgment in assessing and presenting its members' grievances." *Young v. United Auto. Workers Labor Employment and Training Corp.,* 95 F.3d 992, 997 (10th Cir.1996).

 The plaintiffs allege the Union acted arbitrarily and in bad faith in not pursuing their grievances. Specifically, the plaintiffs accuse the Union of deceiving them about the companies being separate when it had already entered into the oral agreement later memorialized in the Administrative Agreement. The plaintiffs accuse the Union of never evaluating the merits of their grievance and then ignoring the impact of the Administrative Agreement.

 No rational trier of fact could find from this summary judgment record that the Union acted arbitrarily or in bad faith in failing to pursue the plaintiffs' overtime grievance. First, the plaintiffs' allegations

about the closeness of the companies and the relevance of the Administrative Agreement are strained and tenuous. Nothing argued by the plaintiffs refutes the uncontroverted facts that the RAPID and RAC were separate companies for purposes of payroll and accounting and that accounting difficulties would exist for employees of one company to work their regular shifts and then work only overtime for the affiliated company. Second, the plaintiffs necessarily concede that the CBA does not require the employer to allow employees of one company to work overtime in another affiliated company. As a result of this concession, another provision of the CBA is triggered, namely, "All matters which are not specifically covered by the Agreement are solely functions and responsibilities of Management." (Dk.87, Ex. 2, CBA, p. 68). The plaintiffs cite no authority nor provision of the CBA that requires management to give employees those rights not prohibited by the CBA. Rather, the CBA plainly vests the management with the authority and discretion to decide on those rights. Thus, the court finds that plaintiffs' allegations and arguments could not reasonably prove that the Union breached its duty of fair representation in telling the plaintiffs their grievance was groundless for it concerned a matter exclusively within managerial discretion or that RAC breached the CBA in refusing the plaintiffs overtime work in RAPID Department 505.

IT IS THEREFORE ORDERED that the defendant's amended motion for summary judgment (Dk.85) is granted on the grounds stated above.